NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0476n.06

Nos. 10-5220; 10-5221

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 13, 2011*

LEONARD GREEN, Clerk

TERRY WILLIAMS, JR.,

    Plaintiff-Appellee,

v.

GREG SANDEL, Officer, In his
Individual and Official Capacity;
ROBERT FULTZ, Officer, In his
Individual and Official Capacity;

    Defendants-Appellants.

and

TREVOR WILKINS, Kentucky Vehicle
Enforcement Officer, In his Individual
Capacity,

    Defendant-Appellant.

_____/

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF KENTUCKY

BEFORE: MARTIN, SUHRHEINRICH and KETHLEDGE; Circuit Judges.

    **SUHRHEINRICH, Circuit Judge.** Plaintiff-Appellee, Terry Williams, Jr. ("Williams"),

brought a § 1983 excessive force claim and several related state law claims against the Defendants-

Appellants, Greg Sandel, Robert Fultz, and Trevor Wilkins ("Defendants"), after they arrested him

on July 8, 2007, in Kenton County, Kentucky. The district court denied Defendants qualified

immunity on the federal and state law claims. Because Defendants' conduct was not objectively

unreasonable, we **REVERSE**.

1

# I. BACKGROUND

## A. Facts

On July 7, 2007, Williams, an African-American male, planned to accompany his cousin to Lexington, Kentucky, to spend an evening out on the town. They began their trip by visiting a liquor store in Covington, Kentucky, to purchase some vodka; Williams also purchased a blue pill, which he believed to be ecstasy. With his cousin driving, the two men headed south on Interstate 75 ("I-75"). Williams took the pill and drank some of the vodka. At some point thereafter, Williams claims that he began to feel extremely hot, and as a result, he decided not to continue to Lexington. After requesting that his cousin pull over on the interstate, Williams exited the vehicle and started walking north in an attempt to return home. Now traveling by foot, Williams, who was still feeling hot, began to remove his clothing "little by little" until he was completely naked. Fully nude, Williams continued to jog north along southbound I-75.

At approximately 11:54 p.m., a motorist traveling on I-75 called 9-1-1 to report seeing a naked man in the southbound lanes of traffic. Kenton County Police Sergeant Greg Sandel ("Sandel") was the first officer to respond to the call. At approximately 12:05 a.m., while driving southbound on I-75, Sandel spotted Williams jogging north in the emergency median strip next to the high-speed lane of the interstate. The highway was not lit, and the only sources of light were the headlights of the police cruiser and passing motorists and, eventually, the officers' flashlights.

Passing Williams, Sandel activated his emergency flashing lights, executed a U-turn into the emergency median strip, and approached Williams from behind (such that the police cruiser faced north in the southbound emergency lane, next to the center median). Williams turned to face the police vehicle and Sandel exited his vehicle to approach Williams. Events beginning at this point

2

are recorded on video ("the video") from a dash-mounted camera in Sandel's police cruiser. The video recorded sound audible inside the unattended cruiser including communication from the police radio, a satellite radio comedy program playing on the cruiser's radio, and occasional, muffled yelling from the officers and Williams. Some recorded portions of the satellite radio program had racial overtones.

As Sandel walked toward Williams, he removed his electronic control device ("ECD") or Taser and held it in his right hand. Williams raised his hands and initially got down onto his knees. Continuous traffic passed by them in the southbound lanes.

Kenton County Officer Robert Fultz ("Fultz") then arrived on the scene from northbound I-75 and had to scale the concrete median to join Sandel and Williams. As Fultz came over the median, Williams stood up and then resumed a kneeling position. From this kneeling position, Williams then adopted the prone position. Laying in the prone position, Williams looked up at Fultz, and initially refused to allow Fultz to grab his left hand. Fultz attempted to grab Williams's left hand again, which Williams allowed. Fultz handcuffed Williams's left hand.

At this point, Kentucky Vehicle Enforcement Officer, Trevor Wilkins ("Wilkins"), reached the scene, also arriving on northbound I-75 and scaling the median to join Williams and the officers. Fultz, holding Williams's left handcuffed hand behind his back, knelt on Williams's back in an apparent attempt to finish securing him. Williams (who at the time of the incident weighed over 200 lbs, appeared to be quite physically fit, and stood between five-feet eight-inches and six-feet tall) used his free right arm to push himself up from a prone position into a seated position. This movement also caused Fultz to lose hold of Williams's left arm. Following Williams's movement, Sandel appears to use the ECD device for the first time. Fultz then appears to direct Williams to

3

resume the prone position. Williams complied. Fultz grabbed Williams's left arm again, at which point Wilkins and Fultz attempted to secure Williams. Williams, however, successfully pushed himself up from a prone position again, preventing Fultz and Wilkins from securing him. In response, Sandel employed his ECD. Also at this point, the off-duty officer riding with Wilkins becomes visible, standing on the northbound side of the median.

Following the ECD charge, Williams laid on his back. Fultz attempted to grab his left arm and to pull him into prone position. Williams did not permit himself to be rolled over and ended up in a seated position again. Fultz then gestured to Williams to resume prone position. Sandel appears to wait a few seconds for compliance before using the ECD again. Following the ECD charge, Williams again laid on his back. He did not resume prone position, and Fultz appears to strike Williams with his baton. Williams then resumed prone position. Fultz secured something in his own belt, possibly his flashlight or ECD, and attempted again to grab Williams's left hand. Williams looked up at Fultz and prevented his hand from being grabbed. In response, Fultz struck Williams on the legs and it appears that Williams was subject to an ECD charge. Following the ECD activation, Williams again laid on his back. Fultz gestured that he should resume prone position. Williams initially complied. However, when Fultz grabbed his left arm, Williams rolled up into a seated position. Fultz struck him on the leg with the baton and it appears that Williams was again subjected to an ECD. All the while, the oncoming traffic did not cease.

Fultz then gestured to Williams, again laying on his back, to resume prone position. Instead, Williams sat up. Wilkins appears to strike Williams on the legs with a baton. Fultz followed with another baton strike to the legs. Fultz then appears to use his baton to strike Williams's right arm. Williams responded by scooting away from the officers toward the travel lanes of the interstate,

4

while maintaining a seated position. The officers continued to gesture toward the ground. Wilkins appears to strike Williams's leg. Williams scooted closer to the travel lanes of the interstate. Just as he reached the yellow line of the high-speed travel lane, it appears that Williams is again subject to an ECD, which caused him to fall from the seated position onto his back such that his head was within the high-speed lane. Fultz grabbed his legs in order to pull him from the travel lane back into the emergency lane.

Again fully in the emergency lane, Williams resumed his seated position and then stood up. Both Wilkins and Fultz appear to strike him with the baton. Rather than complying, he ran into the travel lanes of the interstate. Sandel employed his ECD and Williams dropped onto his stomach in the high-speed lane. Sandel and Fultz tried to remove him from the lane and Wilkins attempted unsuccessfully to stop a vehicle that was simultaneously passing the group. At this point, the off-duty officer scaled the median. Williams stood up, unsecured, and moved further south in the traveled portion of the interstate. The off-duty officer entered the travel lanes in an attempt to stop traffic. Wilkins then followed Williams, Sandel, and Fultz south on the interstate. From this point onward, the group is no longer in view of the video.

In Williams's version of the above events, he was fully compliant with the officers. Williams also maintains that when Fultz first attempted to handcuff him, Fultz asked the other officers "does anyone have a rope." Williams alleges that this statement caused him to fear for his life and, thus, to refuse Fultz's attempt to secure him in handcuffs. Williams also asserts that the officers took turns discharging their ECDs on him, but the ECD download sheets for Sandel and Fultz indicate this assertion is inaccurate and that Fultz did not begin to use his ECD until after Sandel's final ECD activation.

5

Williams claims that he "attempted to escape" the encounter with the officers by heading south on the interstate. An eyewitness at the scene observed:

> [The officers] were all following [Williams] or chasing after him more or less, and he just, he was running across I-75, running back and forth, zigzagging, trying to dodge the cops . . . . And they actually, they finally got a hold of him I believe one of them tackled him or something and then they did hit him with their billy club to try and get his arms locked like this, backwards, like holding himself up. And one of them was hitting him in the elbow, but it wasn't, it wasn't phasing him at all. So, then after that, I believe he got up and they tased him and that didn't stop him. He just ripped the taser right out of himself, and then kept running down the road. And I believe they caught him down the road again, but I could, I could barely see that far. That was probably another eighth of a mile to a quarter mile down the road that he ran from them, all in the same side of the median though on I-75.

Williams claims that during this portion of the encounter he continued to be beaten, tased, and sprayed with chemical irritant spray, and we accept his assertion. Fultz and Wilkins admit to spraying him with pepper spray and maintain that it had no effect on Williams.

Ultimately, Fultz, Sandel, and Wilkins were able to corner Williams such that his back was against the concrete median separating the north- and southbound portions of the interstate. Fultz asserts that Williams attempted to scale the median to escape onto the northbound side.

While Williams was backed against the median, Fultz acknowledged that the officers continued to use their batons to try and gain compliance from him. During this period, Williams also sustained an injury to his head.

Williams claims that he ultimately collapsed from exhaustion and at that point was placed in handcuffs and leg shackles. Boone County Deputy Sheriff Scotty Hill ("Hill"), who was not named as a defendant, arrived at the scene at approximately 12:15 a.m. He reported that Williams and the officers were several hundred yards south of where traffic was stopped. He ran south toward the group. Hill stated that:

6

The officers were giving [Williams] verbal commands to get on the ground. The officers would pause and give him an opportunity to comply with their verbal command. When he refused to comply, he was struck in the thigh with an expandable baton. I heard and observed this sequence several times.

I also noticed that taser probes were still in the male subject but the leads were gone. In my experience, it is not unusual for subjects who have been tased to try and pull the probes out and disconnect the leads. Once this occurs, the probes are disconnected from the taser device and it will no longer be effective to subdue an individual.

I also noticed that the officers who were around him were exhausted from the physical confrontation. Since the subject was noncompliant with the officers' efforts to arrest him, I discharged my taser into his back. I squeezed and released the taser trigger and it cycled for five (5) seconds. The subject fell face down on the ground while the taser cycled for the five (5) seconds. After the first five (5) second cycle ended, the subject started to push up from the ground, so I squeezed and released the trigger again while the probes and leads still had a good connection. The taser cycled for another five (5) seconds.

After the second taser cycle ended, one of the officers was able to secure the second handcuff on the subject.

It is undisputed that once the officers secured Williams, there was no additional force used against him.

During the encounter, Sandel requested emergency medical services. The emergency medical team put Williams on a stretcher. Because he was "combative and screaming" and had "chewed-up" two non-rebreather masks, the team ultimately secured him to the stretcher. So secured, he was transported by ambulance to St. Luke's Hospital. Dr. Paul Spellman, the treating physician, indicated that Williams arrived with a scalp laceration, two fractured fingers, contusions on his torso and extremities, and abrasions on his feet. The initial drug and alcohol screens were both negative. Dr. Spellman found that Williams had an elevated white blood cell count, which could be attributable to general stress on the system as well as physical exertion. Given Williams's urinalysis

7

findings and elevated creatinine levels, there was a concern that he was experiencing a condition known as rhabdomyolysis, "which is when there has been a muscle injury which causes products from within the muscle cells to be released into the circulation; it can result in damage to the kidneys"; Williams ultimately had to undergo a series of dialysis treatments after his release from the ER.

In addition to rhabdomyolysis, a psychological exam conducted on January 15, 2009 indicated that Williams suffered Post Traumatic Stress Disorder as a result of the events of July 7 and 8, 2007.

### B. Procedural History

On September 25, 2008, a Kenton County jury convicted Williams of disorderly conduct, but a mistrial was declared for the charges of resisting arrest, fleeing, and wanton endangerment. The matter was reset for trial on March 17, 2009, but before trial, Williams entered a plea agreement with the Commonwealth. He pled guilty to wanton endangerment and entered an Alford plea on the resisting arrest charge.

On August 2, 2007, Williams filed a civil complaint in Kenton Circuit Court. The case was removed to federal court and thereafter Sandel and Fultz filed for summary judgment arguing that the force used was not objectively unreasonable, and even if it were, they were entitled to qualified immunity. Wilkins also filed a motion for summary judgment, asserting qualified immunity. Additionally, Wilkins argued Williams's state, arrest-related criminal convictions collaterally estopped him from asserting an excessive force claim.

Williams opposed the summary judgment motions. He argued that there was sufficient evidence to create a genuine issue of material fact regarding his claims and that the officers should

not receive qualified immunity because they used excessive force in violation of clearly established rights.

On December 8, 2009, the district court held oral argument on the motions for summary judgment. Ruling from the bench, the court denied the officers' request for summary judgment:

> My job is, are there factual issues which preclude summary judgment on the excessive force claim. I answer that "yes." At this stage I think there are a number of disputed issues of material fact which preclude summary judgment on the Fourth Amendment claim.
>
> There has been sufficient facts to allege constitutional depravity under the Fourth Amendment. So then for the same reasons under the plaintiff's version of facts, I cannot say that the officers – If the jury were to believe plaintiff's version of what occurred, I am unable to say that an officer would not know what they did was unreasonable under the facts and circumstances of the case.
>
> So the request for the Court to uphold the officers' use of force in this case under the theory of qualified immunity analysis is denied at this point, and that includes the motions filed by Sandel and Fultz and the motion filed by Defendant Wilkins.
>
> . . . .
>
> The Court is denying – I want to make sure the record is painstakingly clear. The denial of the motion for summary judgment with qualified immunity is based on facts that the Court finds are in dispute. The qualified immunity motion was made at the end of discovery. There are – And I'm not going to go into all the issues of disputed fact. [Williams's counsel] has highlighted many of those in his brief . . . [and] . . . during oral argument this afternoon.

Additionally, the district court denied Wilkins's argument that collateral estoppel barred Williams from asserting an excessive force claim. The court also retained Williams's state-law battery and negligence claims: "The two battery and negligence claims, in the Court's view, those rise and fall with the same considerations, analysis of the federal law claims." Finally, it rejected the request to compartmentalize or segment the excessive force analysis into the force used on and off the video.

9

Two days later, on December 10, 2009, the district court issued an order on its decision, stating only that summary judgment was denied on the excessive force, battery, and negligence claims "for the reasons stated and the findings made on the record."

On December 16, 2009, the officers moved for partial reconsideration. Citing the video, they argued that there were no disputed issues of fact with respect to the force shown and that, accordingly, they were entitled to judgment as a matter of law. The motion also argued that the district court, per the precedent of the Sixth Circuit, should segment the analysis for purposes of qualified immunity. On February 1, 2010, the district court denied the motion for reconsideration, explaining that the "disputed nature of the conduct depicted in the video, coupled with the video's lack of audio, rendered segmentation impractical and inappropriate."

This appeal followed.

## II. Analysis

## A. Jurisdiction

The officers file this interlocutory appeal pursuant to 28 U.S.C. § 1291. Williams challenges jurisdiction, arguing that the officers raise questions of fact that preclude this court's review.

An appellate court may hear an interlocutory appeal for the "denial[] of summary judgment motions based on qualified immunity to the extent that the appeal raises issues of law." *Grawey v. Drury*, 567 F.3d 302, 310 (6th Cir. 2009) (citations omitted). Applying Kentucky immunity law, we also have jurisdiction to review the denial of qualified immunity for the state law claims. *See Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007); *Haney v. Monsky*, 311 S.W.3d 235, 239-40 (Ky. 2010).

10

We review de novo the district court's denial of qualified immunity for federal and state law claims. *Id.* (federal standard); *Estate of Clark, ex rel. Mitchell v. Daviess County*, 105 S.W.3d 841, 844 (Ky. App. 2003) (state standard). This de novo review is based on the facts viewed in the light most favorable to the plaintiff, or in other words, we presume the plaintiff's version of the facts is correct if the facts are disputed. *Grawey*, 567 F.3d at 310.

## B. Qualified Immunity: § 1983 Excessive Force Claim

The officers claim that they are entitled to qualified immunity because the force used was reasonable given the circumstances they faced: a naked man on the interstate in the middle of the night, who was unwilling to allow himself to be secured. They also maintain that even if the force was not objectively reasonable, they are entitled to qualified immunity because the force used did not violate clearly established law. Sandel and Fultz assert qualified immunity for their ECD, police baton, and pepper spray usage. Wilkins asserts qualified immunity for his baton and pepper spray usage. Williams argues that in effecting his arrest, the officers violated his Fourth Amendment right to be free from excessive force by their repeated usage of the ECD, police batons, and pepper spray.[1]

Stating a claim for excessive force under 42 U.S.C. § 1983 requires a plaintiff to establish "the deprivation of a right secured by the Constitution or laws of the United States" that is "caused by a person acting under color of state law." *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007) (internal citations and quotation marks omitted). The doctrine of qualified immunity operates

---

[1]In his brief, Williams also asserts that Wilkins is responsible for his failure to intervene to stop the allegedly excessive number of ECD activations by Sandel and Fultz. Wilkins accurately points out that Williams failed to include a failure to intervene allegation in his complaint and explicitly informed the district court that this type of claim was not at issue. Because this claim was not raised before or considered by the district court, Williams forfeited this claim. *See Meade v. Pension Appeals & Review Comm.*, 966 F.2d 190, 194 (6th Cir. 1992) (stating that appellate court generally "will not address issues on appeal that were not raised and ruled upon below").

11

to shield government officials performing discretionary functions from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determining the applicability of qualified immunity involves a two-step analysis. First, the court asks whether the officers' conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[2] If no constitutional violation exists, the inquiry stops, the § 1983 claim fails as a matter of law, and the officers do not need qualified immunity. *Marvin*, 509 F.3d at 244. But if the court finds a potential constitutional violation, it then asks whether the right was clearly established in light of the specific circumstances of the case. *Saucier*, 533 U.S. at 201.[3] When the law is not sufficiently clear such that a reasonable officer would be on notice that his conduct is clearly unlawful, qualified immunity is appropriate. *Id*. at 202.

**1. Constitutional Violation**

Williams's claim of excessive force is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). In considering whether the officers' conduct is objectively reasonable, this court must look at the facts and circumstances of the case from the perspective of a reasonable officer at the scene and not using 20/20 hindsight. *Grawey*, 567 F.3d at 310. With this perspective, the court must balance "the nature

---

[2]While *Saucier* held that the sequence of this analysis, as it is portrayed here, was mandatory, the Supreme Court has since stated that conducting the analysis in this order, while beneficial, is not required. *Pearson v. Callahan*, 555 U.S. 223 (2009).

[3]A third step considering whether a "plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional right" is used by some courts, but is redundant in an excessive force analysis that already considers whether the conduct was objectively unreasonable. *Grawey*, 567 F.3d at 309.

and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal citations and quotation marks omitted). The most important factors to consider include: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. at 396.

### a. Severity of the Crime

As Wilkins points out, Williams's behavior might have given rise to several violations under state law, including: public intoxication, indecent exposure in the second degree, disorderly conduct in the second degree, and impermissibly walking on the highway. *See* Ky. Rev. Stat. § 525.100 (public intoxication); Ky. Rev. Stat. § 222.202 (alcohol intoxication); Ky. Rev. Stat. § 510.150 (indecent exposure); Ky. Rev. Stat. § 525.060 (disorderly conduct); Ky. Rev. Stat. § 189.570(14), (16) (walking on or along a highway). Although not the most serious of criminal violations, surely Williams's bizarre conduct, jogging naked on the interstate in the earliest hours of the morning, provided several reasons for the officers to stop and detain him.

### b. Immediate Safety Threat

Considering first the portion of the encounter recorded on the video, it is clear that Williams posed an immediate threat to the safety of himself and the officers, as well as passing motorists. Williams's nudity clearly conveyed to the officers that Williams was unarmed. Yet Williams created a risk of serious harm by virtue of the location and his actions. In fact, in the initial seconds of Sandel's interaction with Williams, before he began resisting the officers' attempts to secure him, eleven vehicles passed on the travel lanes of southbound I-75. Granted, Sandel and Williams

13

remained in the emergency lane next to the median, but even so, there is some risk inherent in standing alongside traffic moving at such high speeds, especially when there is an individual involved who has been engaging in bizarre and highly erratic behavior.

Once Williams began resisting Fultz's attempts to secure him in handcuffs, the risk dramatically increased for all involved: Williams, the officers, and the passing motorists. As seen on the video and described above, Williams's movements became erratic and he repeatedly moved toward the travel lanes of the interstate. Correspondingly, the officers were forced to move closer to the travel lanes as well. Approximately nineteen more vehicles passed while the officers attempted to secure Williams in the emergency median. At least one vehicle passed while Williams and the officers were *in* the high-speed and middle travel lanes of the interstate. As Williams exited the view of the camera and headed south in the travel lanes of the interstate, up to three additional vehicles passed before traffic was stopped. Obviously, the risk of serious bodily injury or death is great when encountering the high-speed traffic present on an interstate. *See generally Scott v. Harris*, 550 U.S. 372, 384 (2007) (acknowledging the risk of serious bodily injury or death present in a pedestrian and high-speed motorist crash). This risk was further heightened by the darkness and limited visibility.

The record indicates that the encounter ultimately returned to the emergency lane next to the median dividing the southbound and northbound portions of I-75. The officers' testimony indicates that Williams attempted to scale the median. Even though southbound traffic remained stopped,[4]

---

[4]The stoppage of traffic certainly diminishes the threat of a fatal or seriously injurious accident. In this case, the traffic was stopped by an off-duty officer wearing civilian clothes and carrying a flashlight. And while the video indicates that the officer effectively and continuously stopped traffic, from the perspective of an officer on the scene, a question may have remained whether a single officer, so dressed and so equipped, would be able to halt interstate traffic until

14

it was reasonable for the officers, given Williams's behavior and position next to a scalable median, to worry about the risk he might pose to motorists on the northbound side of I-75. Plainly, Williams's conduct from the beginning of the encounter until he was secured posed an immediate threat of injury or death to himself, the officers, and other motorists by virtue of the circumstances.

### c. Actively Resisting Or Attempting To Evade

Again, the video demonstrates that Williams actively resisted the officers' efforts to secure him. Although Williams insists that he was compliant with the officers, the video makes clear that he repeatedly refused to allow himself to be secured by the officers and he attempted to evade the officers by traveling south on the interstate (out of view of the camera). *See Scott*, 550 U.S. at 380-81 (holding that a court should rely on the video record when the plaintiff's version of the facts blatantly contradicted it). Even after he was cornered against the median, he refused to submit to being secured until two final ECD activations allowed the officers to handcuff him.

It is against this backdrop that we must weigh the officers' conduct. Although Williams's offenses were arguably not of extreme severity, law enforcement surely has an interest in efficiently securing a suspect. And that interest was heightened under the circumstances presented here; the officers had a strong interest in securing Williams for his own protection as well as theirs and the protection of passing motorists. As a result, the force used, which ceased once the government's interests were realized, weighs in favor of a finding of reasonableness.

_____

Williams was secured.

Admittedly, Williams's claim of being subject to baton strikes, pepper spray, and thirty-seven ECD activations,[5] taken alone and out of context, makes the officers' conduct seem somewhat unreasonable. But even under Williams's version of the facts, despite the first thirty-six ECD activations, all of the baton strikes, and the repeated pepper spray usage, Williams remained unsecured and unwilling to comply with the officers' attempts to secure him for his own safety as well as the officers' and motorists'. As a result, his interests do not outweigh the government's.

Williams also attempts to emphasize the allegedly excessive nature of the force by highlighting his injuries. Even assuming that the rhabdomyolysis was tied to the ECD activations, the injury itself does not dictate a finding of excessive force. *See Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010) (explaining that the existence of a constitutional violation turns on "not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence" per the *Graham* analysis (citation and internal quotation marks omitted)).

Nor does Williams's allegation about a racially charged comment transform the officers' force into excessive force. *See Hudson v. Goob*, No. 07-1115, 2009 WL 789924, at *12 (W.D. Penn. Mar. 24, 2009) ("The rule is that if the physical force used is not itself excessive, i.e., is reasonable, then merely adding verbal threats or racial epithets cannot transform an otherwise non excessive use of force into an unconstitutional use of excessive force."); *Johnson v. City of Ecorse*, 137 F. Supp. 2d 886, 892 (E.D. Mich. 2001) ("Policemen's use of slurs and racial epithets is not a search or seizure, and thus cannot sink to the level of violating the Fourth Amendment's prohibition of

---

[5]Williams's claim of thirty-seven ECD activations is based on downloads recorded from Sandel's ECD (fourteen total activations) and Fultz's ECD (twenty two activations) as well as one activation from Deputy Hill. We note that Deputy Hill's deposition indicates that he used his ECD on Williams twice, which would bring the total ECD activations in the record to thirty-eight.

16

excessive force."); *see also Giese v. Wichita Police Dep't*, 69 F.3d 547, 1995 WL 634173, at *2 (10th Cir. 1995) (unpublished table opinion) ("Verbal threats during questioning also do not constitute the use of excessive force.").

Although the reasonableness of force is often a question of fact, on several occasions we have determined that force is objectively reasonable. In a case quite similar to this one, we held that the use of "closed-fist blows" and ECD activation during an officer's attempt to effect the arrest of a potentially armed, non-compliant suspect did not amount to a constitutional violation. *Williams v. Ingham*, 373 F. App'x 542 (6th Cir. 2010). This court found that it was objectively reasonable for an officer to use pepper spray to force a non-compliant individual to follow police orders. *Monday v. Oullette*, 118 F.3d 1099, 1104 (6th Cir. 1997). *Kijowski v. City of Niles*, 372 F. App'x 595 (6th Cir. 2010) is not to the contrary. There we held that the beating and use of an ECD against a non-resisting subject was not objectively reasonable. *Id*. at 600. However, central to the court's conclusion was the suspect's non-resistance. The *Kijowski* court was careful to distinguish case law which held that use of physical force against a resisting suspect is not objectively unreasonable. *Id*. (citing *Casey v. City of Federal Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007) (emphasizing that the use of physical and ECD force against an individual actively resisting arrest could be a reasonable use of force)).

Finally we note that other circuits have likewise recognized the danger posed by proximity to a busy roadway in finding the use of force against a non-compliant individual objectively reasonable. *See Buckley v. Haddock*, 292 F. App'x 791, 796 (11th Cir. 2008) (holding that repeated ECD usage on a non-compliant suspect during an arrest on the side of a busy highway at night was objectively reasonable); *Mecham v. Frazier*, 500 F.3d 1200, 1205 (10th Cir. 2007) (holding that

17

pepper spray usage on a non-compliant suspect was objectively reasonable when the "encounter played out on the narrow shoulder of a busy interstate highway" with "high speed traffic" nearby).

Accordingly, we conclude the officers use of ECDs, batons, and pepper spray was not objectively unreasonable on the facts presented and did not amount to a violation of Williams's Fourth Amendment rights. Although the lack of video capturing the entire interaction between the officers and Williams makes this a slightly more difficult question, the evidence, even taken in the light most favorable to Williams, still supports a conclusion that the officers' conduct did not amount to a constitutional deprivation.[6]

### D. Qualified Immunity: State Law Claims

Williams also brought state-law claims of battery and negligence against the officers. State-law qualified immunity protects officers from liability for discretionary acts, taken in good faith, within their scope of authority. *See Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Bad faith can be demonstrated by objective unreasonableness or by a subjective intention to harm (i.e., a "corrupt motive"). *See id.* at 523. As with federal qualified immunity, it is Williams's burden to establish that the officers' actions were not performed in good faith. *James v. Wilson*, 95 S.W.3d 875, 905 (Ky. Ct. App. 2002).

Without authority or even any description of the negligence claim's elements, Williams alleges that a reasonable juror could conclude that the "officers exceeded the bounds of force reasonably needed to affect the arrest and thereby were negligent[.]" Arguably, his negligence claim is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997). In any event, the claim

---

[6]Because we conclude that the officers' conduct was not objectively unreasonable, we decline to address the district court's decisions on collateral estoppel and segmentation.

merely alleges a breach of the "duty not to use excessive force." *Jones v. Kentucky Bd. of Claims*, No. 2006-002157, 2007 WL 2812612, at *3 (Ky. Ct. App. 2007). This claim thus follows the excessive-force analysis.

We have already concluded that the officers used reasonable force. Therefore, Williams's state law claims survive only if the officers acted with a subjective intent to harm him. Williams says that Fultz's reference to a rope, a racial radio broadcast, and the "abuse . . . despite his compliance" establish the requisite subjective intent. None of these allegations support Williams's claim. As we have explained, Williams was non-compliant. The "racial radio broadcast" is irrelevant: a radio comic's remarks, broadcast 15 minutes after Sandel exited his police vehicle, say nothing about the officers' motives. Finally, even assuming Fultz made the rope comment, we find that the comment is insufficient as a matter of law to defeat the presumption that Fultz acted in good faith with respect to his attempts to subdue Williams in the extraordinary circumstances presented here. *See Rowan Cnty v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) ("once the material facts are resolved, whether a particular defendant is protected by official immunity is a question of law, which we review de novo" (internal citation omitted)). We thus hold that the officers are entitled to qualified immunity on Williams's state-law claims.

### III. CONCLUSION

For the foregoing reasons, we **REVERSE** the district court's denial of summary judgment on federal and state-law qualified immunity.