ALICE M. BATCHELDER, Chief Circuit Judge,
concurring in part and dissenting in part.
I would affirm the district court’s orders in their entirety. Therefore, I concur in the majority opinion but for Section II.B.l, in which the majority finds that Officer Jim Wilkins was deliberately indifferent to arrestee Jackson’s serious medical need. Because I agree with the district court that, on this record, a reasonable jury could not find that Officer Wilkins actually perceived a substantial risk to Jackson, and because I find no evidence that Officer Wilkins displayed the requisite mental state, I must respectfully dissent from that portion of the opinion. I -write separately to explain.
I.
A constitutional claim for deliberate indifference contains both an objective and a subjective component. Harris v. City of Circleville, 583 F.3d 356, 368 (6th Cir.2009) (citations omitted). The objective component requires the plaintiff to show the existence of a “sufficiently serious” medical need, id. (quotation marks omitted); that is, an actual “need for medical treatment [that] ... was not addressed within a reasonable time,” id. at n. 6 (quotation marks and citation omitted). Jackson’s internal liver laceration was a life-threatening injury that needed timely medical treatment.
Accepting that the plaintiff (the estate of the deceased arrestee) has satisfied the objective component of the deliberate-indifference test leads us to the other half, the subjective component:
To satisfy the subjective component, the plaintiff must allege facts which, if true, would show
that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner,
that he did in fact draw the inference, and
that he then disregarded that risk. Emphasizing the subjective nature of this inquiry, ... an official’s failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment.
Comstock v. McCrary, 273 F.3d 693, 703 (6th Cir.2001), relying on Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks omitted, paragraph breaks added, and emphasis altered).
The district court and the majority both identified and relied on this same three- *323 part test and both acknowledged the same general facts concerning Jackson’s condition, but they drew opposite conclusions when applying this test to these facts. In the district court’s view, these facts would not demonstrate that Jackson was at a substantial risk of a serious medical need, and moreover, no officer (including Officer Wilkins) had actually drawn any such inference from these facts:
Upon careful review of the record, th[is] [district] [c]ourt finds that Plaintiff has not met [it]s burden of presenting evidence that any of the Benton Harbor Defendants were aware that [Jackson] had a serious medical condition when he was in the custody of the Benton Harbor officers [which includes Officer Wilkins].
Plaintiff relies on observations by Officers Wilkins and Blaskie that Jackson required assistance in getting into the police vehicle after being subdued, and that he had suffered injuries. Plaintiff also relies on the fact that [Jackson] defecated in the police vehicle en route to the jail. However, this evidence does not support a finding that the Benton Harbor officers were aware of facts from which the inference could be drawn that a substantial risk of serious medical harm existed, and that one or more of the officers actually drew that inference.
The visible injuries sustained by Jackson — scrapes and a bruise — were not plainly indicative of life-threatening condition. Jackson’s difficulty in standing up and getting into the police vehicle would not seem extraordinary given the alley tussle and the fact that Jackson was handcuffed behind his back. Finally, the officers’ decision to transport Jackson to jail rather than to a hospital was made prior to his defecation in the police vehicle.
The Benton Harbor police officers made a decision to transport an uncooperative arrestee directly to jail, knowing that the jail would have a nurse and medical clinic. Jackson himself stated that he did [not] need to go to a hospital.[1] While the officers knew that Jackson had suffered superficial injuries from their use of non-lethal force, there is no evidence that the officers knew or could have known that Jackson had suffered a life-threatening injury. The seriousness of Jackson’s condition was arguably more apparent by the time the officers arrived at the Berrien County jail, but the Benton Harbor officers were told by nurse Haueisen that ‘if he needs to go to the hospital, we’ll take care of it.’
On these facts, it cannot be said that [any] reasonably competent officer would conclude that the Benton Harbor officers’ decision to transport Jackson directly to jail would be a violation of his constitutional rights. Accordingly, the Benton Harbor Defendants are entitled to qualified immunity and summary judgment on all claims pertaining to their alleged failure to provide medical care.
R. 162 at p. 10-11 (Dist.Ct.Op., Mar. 28, 2012) (editorial marks and citations omitted).
But in the majority’s view, the facts demonstrate that Jackson was at a sub *324 stantial risk of a serious medical need and also that Officer Wilkins (alone) not only recognized that risk but then consciously disregarded that risk as a means of inflicting punishment on Jackson. See Miller v. Calhoun County, 408 F.3d 803, 813 (6th Cir.2005) (explaining that the officer’s “state of mind must evince deliberateness tantamount to intent to punish”). The majority reverses the grant of qualified immunity to Officer Wilkins, while affirming the grant of immunity to all other defendants.
I cannot join the majority in this conclusion. When I apply the controlling law to the generally agreed-upon facts, I do not find these facts as compelling as the majority does; I do not find it reasonable to presume from these facts that Officer Wilkins actually recognized a substantial risk of a life-threatening injury; and I do not find that Officer Wilkins acted with the requisite mental state of “deliberateness tantamount to intent to punish,” see Miller, 408 F.3d at 813.
II.
There is no dispute about the controlling law. We apply the aforementioned three-part test to determine the subjective component of a constitutional violation for deliberate indifference. See Farmer, 511 U.S. at 837, 114 S.Ct. 1970; Harris, 583 F.3d at 368; Comstock, 273 F.3d at 703.
A.
First, the plaintiff must allege facts which, if true, would have been sufficient to alert the defendant to the substantial risk to the arrestee. Comstock, 273 F.3d at 703. This is not a rigorous standard and, in fact, the Supreme Court phrased this as “facts from which the inference could be drawn that a substantial risk of severe harm exist[ed].” Farmer, 511 U.S. at 837, 114 S.Ct. 1970 (emphasis added). More importantly, the plaintiff must show that the defendant actually recognized or perceived those facts. Comstock, 273 F.3d at 703. The majority identifies and relies on six specific facts: (1) Jackson claimed he could not stand up; (2) Jackson moaned for help from Jesus; (3) Jackson had a chest bruise; (4) Jackson displayed rapid physical deterioration; (5) Jackson had a violent collision with a dumpster; and (6) Jackson was not so drunk that he could not run or fight.
There is no dispute as to whether Officer Wilkins recognized or perceived these facts — he did. The only question at this point is whether these facts indicate a substantial risk to Jackson due to a serious medical problem. The district court held that these facts did not indicate a substantial risk whereas the majority holds that they did. Although I am inclined to agree with the district court, I am willing to concede any factual dispute and agree that, viewed generously (and out of context), these facts “could” indicate a substantial risk of a serious medical need. Therefore, I will accept for the present that the plaintiff has satisfied this first part: Officer Wilkins actually perceived facts from which he could have inferred a substantial risk to Jackson. See Comstock, 273 F.3d at 703.
B.
For the second part of the three-part test, the plaintiff must allege facts which, if true, would show that the defendant did in fact draw the inference of a substantial risk of life-threatening injury to the arres-tee. Comstock, 273 F.3d at 703. The majority reiterates the same six (6) facts as proof that Officer Wilkins actually, subjectively drew the inference that Jackson was at serious risk of a life threatening *325 injury. There are two aspects to this that compel my disagreement.
First, this part of the test is supposed to be about the defendant — did the defendant actually draw the inference? See Comstock, 273 F.3d at 703. The most direct way to satisfy this part would be for the plaintiff to allege facts about the defendant’s statements, actions, inactions, etc. Specifically, in order to show that Officer Wilkins actually drew an inference, there would be some fact alleged about Officer Wilkins. Here, all we have are six facts about Jackson, and those just the same six merely reiterated from the first part of the test. The plaintiff has pointed to no facts about Officer Wilkins to show that he actually drew the inference and the majority cites none either.
But there is a second aspect to this that warrants some considerable discussion, inasmuch as a plaintiff may satisfy this part by showing that the risk was “so obvious and substantial that the officialf] must have known about it.” Farmer, 511 U.S. at 852, 114 S.Ct. 1970 (Blackmun, J., concurring); accord Harris, 583 F.3d at 368 (relating that “a fact-finder may conclude that [an] official knew of a substantial risk from the very fact that the risk was obvious” (quotation marks and citations omitted)). In such a situation, facts about the arrestee or the surrounding circumstances (i.e., the same facts that satisfy the first part) could be or would be sufficient to satisfy the second part. Although unartic-ulated, it might be that this is the majority’s view of the present facts — that these six facts render the risk so obvious that Officer Wilkins must have known. If so, I cannot agree.
Before considering the individual facts, it bears mention that Jackson’s lacerated liver was wholly unknown and unsuspected by anyone until after the autopsy. Immediately upon crashing into the dumpster, thereby lacerating his liver, Jackson jumped back up and took off running again. The officers chased him and, in an effort to subdue him, tased him, wrestled him down, kneed him in the back and legs, hit him, and tased him even more (12 times in all). Eventually, they wore him out, cuffed his hands behind his back, and laid him on his stomach. R. 121-2, p. 12-16; 135-2, p. 17-22. Nothing suggests that either Jackson or the officers knew that Jackson had lacerated his liver. The officers did know that Jackson was drunk, which was later confirmed when the autopsy revealed that his blood alcohol was 0.17 at the time of his death, some four hours after this fight with and flight from the police. R. 121-2, p. 4 (time of death 8:45 a.m.); p. 37 (0.17 blood alcohol content).
Neither the jail deputies[2] nor the jail nurse, Mark Haueisen, suspected a lacerated liver or internal injuries. R. 136-2 (Haueisen depo.). The paramedics who responded to the call spent 34 minutes treating Jackson in the ambulance (6:42 a.m. to approximately 7:16 a.m., the first 31 sitting in the port at the jail, see R. 121-2 p. 47), but did not suspect a lacerated liver; rather they administered “CPR for cardiac arrest,” see R. 135-3, p. 4. And the Lakeland Hospital emergency staff spent 1.5 hours (approximately 7:15 a.m. to 8:45 a.m.) treating Jackson in the emergency room, but the lacerated liver was not discovered until the autopsy. That same morning, while Jackson was still in the hospital but “not expected to survive,” the Michigan State Police initiated an investigation and at that point, prior to the au *326 topsy, an investigator noted that “the pathologist performing the autopsy should contact the University of Miami [ ] in reference to evidence collection from deaths as a result of excited delirium.” R. 121-2, p. 7 (emphasis added). Later, a second Michigan State Police investigator noted in his report that he had spoken with Jackson’s girlfriend, Imogene Wade, at approximately 12:50 p.m. that day and had told her that Jackson had apparently died from “heart failure” or a “heart attack.” R. 121-2, p. 37. He noted that a preliminary assessment by medical examiner Dr. Robert Clark had also suggested a heart attack. R. 121-2, p. 37. The lacerated liver was neither suspected nor discovered until the full autopsy the next day. R. 121-2, p. 39.
The majority cites six facts from which Officer Wilkins must have drawn the inference that Jackson was at a substantial risk of serious harm. See Farmer, 511 U.S. at 837, 114 S.Ct. 1970. These facts are: (1) Jackson claimed he could not stand up; (2) Jackson moaned for help from Jesus; (3) Jackson had a chest bruise; (4) Jackson displayed rapid physical deterioration; (5) Jackson had a violent collision with a dumpster; (6) Jackson was not so drunk that he could not run or fight. Let us consider whether any of these six facts render the underlying risk “so obvious and substantial that [Officer Wilkins] must have known about it.” See Farmer, 511 U.S. at 852, 114 S.Ct. 1970 (Blaekmun, J., concurring).

1. Jackson’s claims that he could not stand up.

After subduing Jackson, Officers Wilkins and Blaskie cuffed his hands behind his back and placed him on his stomach while all three paused to catch their breath as they recovered from the chase and the fight. R. 122-3 p. 17, 61:11-13 (“the officers ... were taking a break because they were out of breath”); R. 121-2 p. 16 (Jackson “was breathing very hard as were both officers”). Officers Wilkins and Blaskie then attempted to direct Jackson into the back of Officer Alsup’s patrol car. In a recording from Officer Alsup’s patrol-car video, Jackson can be heard gasping and slurring his words, and then he said several times that he could not stand up on his own, while the officers coaxed and threatened him to get in the car. R. 122-4 (Alsup In Car Video, 6:42 to 8:01 min. mark). This conversation lasted a little over one minute while the officers put Jackson into the car.
The officers’ comments on the recording, their testimony, and the findings of the Michigan State Police investigation indicate — and there is no evidence to the contrary — that neither the officers at the scene nor anyone else believed Jackson’s claims that he could not stand up. See R. 121-2 p. 14 (Wilkins statement to the Michigan State Police investigator); p. 16 (Blaskie statement); p. 19 (Alsup’s statement that Jackson “looked no different than anyone who has fought with or ran from the police.”); R. 121 — 4 p. 30, 29:1-20 (Wilkins depo.); R. 121-3, p. 19-20, 69:21-72:21 (Blaskie depo.); R. 122-3 p. 21-24 (Alsup depo.); R. 136-2 p. 17, 56:21-57:20 (Haueisen depo., expressing a belief that Jackson’s refusal to stand might have been a form of “passive resistence”). The majority, however, holds that Officer Wilkins did believe that Jackson could not stand up and that from that belief he drew the inference that Jackson was at risk of a life-threatening injury.
Even assuming that Officer Wilkins did believe that Jackson could not stand up, it is at most possible that Officer Wilkins attributed the cause to a life-threatening injury — it is just as likely that Officer Wilkins attributed the cause to Jackson’s ex *327 haustion, intoxication, hands being cuffed behind his back, or passive resistence.[3] Jackson had just crashed a car, engaged in a lengthy fight with and flight from the police, been manhandled and tased multiple times, and had his hands cuffed behind his back. During the 80 seconds that he claimed he could not stand up, he was visibly drunk and gasping for breath. As the district court put it: “Jackson’s difficulty in standing up and getting into the police vehicle would not seem extraordinary given the alley tussle and the fact that Jackson was handcuffed behind his back.” More to the point, I cannot agree that this fact implicates an underlying risk so obvious and substantial that Officer Wilkins must have known about it.

2. Jackson moaned for help from Jesus.

After claiming that he could not stand up, and being placed in Alsup’s car, Jackson pled to God and moaned for the next few minutes. R. 122-4 (Alsup In Car Video, 8:01 to 13:36 min. mark).
Jackson: Please, help me. Please, Lord. Please, help me, Jesus. I cannot stand. I cannot stand. Oh, Lord, help me. Jesus, help me. Help me, please. Help me. Help. Help me. Oh, Lord. Oh.
R. 122-4 (Alsup In Car Video, 8:01 to 8:27 min. mark). Whereas Officer Wilkins characterized this as Jackson “just saying, ‘Oh Jesus, help me out of this’ ” trouble I’m in with the police, R. 121-2 p. 14, the majority holds that Jackson’s pleas and moans “made clear that [Jackson] was in serious pain.” While it is certainly possible — even likely given his actual injury— that Jackson was in pain, I cannot agree that this pleading and moaning necessarily demonstrates that pain or, more to the point, necessarily renders the underlying risk unmistakably obvious and substantial.
Recall that Jackson had just finished a lengthy flight from and fight with two police officers, been manhandled and tased multiple times, and was drunk, captured, and in serious trouble. More importantly, Jackson never said: “I am injured,” “I am in pain,” “my chest/stomach/liver is injured,” “my chest/stomach hurts,” “I ran into a dumpster,” “I need a doctor,” “I am dying,” or anything like that. Although he moaned and prayed, Jackson never complained expressly about any injury or pain. In fact, the next time Jackson is heard to speak on the recording, he says just the opposite:
Officer Alsup: You feel alright?
Jackson: Yeah, I feel okay.
R. 122-4, 2:55. This is consistent with the statements by and testimony of all three officers (Wilkins, Blaskie, and Alsup), to the effect that Jackson had no desire to go to the hospital. R. 121-2 p. 14, 16, 19, 34; 121-4 p. 21, 20:15-18, 27:22-28:9; 122-3 p. 22, 80:16-81:8, 82:19-83:2, 88:4-25.
The standard requires (and the majority holds) that Officer Wilkins must have subjectively recognized from these statements and moans that Jackson was in such pain as to put him at risk of a serious, life-threatening injury. But given the circumstances and the incredibly vague nature of Jackson’s statements, it would not have been unreasonable for Officer Wilkins to think (even mistakenly) that Jackson was *328 just lamenting the trouble he was in. A reasonable person under these circumstances would not necessarily conclude from these few minutes of praying and moaning that Jackson was in such pain that he was at risk of a life-threatening internal injury. Moreover, I do not find it reasonable to conclude that Officer Wilkins necessarily drew such an inference.

3. Jackson had a large bruise on his chest.

Officer Wilkins testified that, while still at the scene, he noticed the bruise on Jackson’s chest, which he assumed had come from Jackson’s running into the dumpster or his fight with the officers. R. 121-4 p. 23, 22:3-7; p. 27, 26:5-22. But Officer Wilkins further testified that he thought that the bruise, as with Jackson’s other injuries, was merely “superficial.” R. 121-4 p. 30, 29:7-14. The district court said the same: “The visible injuries sustained by Jackson — scrapes and a bruise— were not plainly indicative of life-threatening condition.” R. 162 at p. 11 (Dist.Ct. Op.). Even the majority appears to discount this fact, accepting as “true” Officer Wilkins’s argument “that Jackson’s superficial injuries — the bruise and a few scrapes — were not serious enough to signal a substantial risk of harm.” If it is true, as both the majority and the district court have written, that the bruise was not so serious as to signal a substantial risk of a life-threatening condition, then it is only reasonable to conclude that it did not in fact alert Officer Wilkins to such a risk.

4. Jackson displayed rapid physical deterioration.

As discussed in the foregoing sections, after the officers subdued and handcuffed Jackson, he stopped fighting and tried to catch his breath. R. 121-2 p. 16 (“[Jackson] went to his knees [and] was breathing very hard ... [so] [Officer Blaskie] let [Jackson] rest for a little bit”). But as the officers attempted to direct Jackson into the patrol car, Jackson was claiming that he could not stand up on his own or help himself into the car. This lasted at least until he was in the car.
In their reports to the Michigan State Police investigator, none of the officers on the scene (Wikins, Blaskie, or Alsup) noted Jackson’s condition as remarkable. In fact, Officer Alsup said that Jackson “looked no different than anyone who has fought or ran from police.” R. 121-2 p. 19. At his deposition, Officer Alsup testified that it was his decision to send Jackson to jail instead of the hospital, R. 122-3 p. 23, 82:7-20, which he based in part on his view of Jackson’s condition:
[Jackson] didn’t appear to be any different than any other person who’s ever ran ... [t]hat’s ever ran from the police and been caught. Intoxicated. Been tased. He’s not the first person that’s ever defecated on their self or urinated on them self during or after a tasing. I’ve been tased myself and had no medical treatment.... Just like everybody else, he — my observation of him was just like any other suspect that’s been taken to jail with no visible injuries.
R. 122-3 p. 24, 88:12-23. As noted previously, the record reveals that none of the officers believed Jackson’s claims that he could not stand up and, a short time later, Officer Alsup asked Jackson, “You feel alright?”, to which Jackson responded, “Yeah, I feel okay.” R. 122-4, 2:55.
The majority says: “Wilkins also saw Jackson’s rapid physical deterioration — in only a few minutes, Jackson went from someone who could run from the police and resist repeated punches, kicks, and electric shocks, to someone who could not walk, sit, or stand up on his own.” This statement assumes two things which may *329 in fact not be true: (1) that Jackson actually could not walk, sit, or stand up on his own; and (2) that Officer Wilkins believed this to be true. This also appears to ignore the likelihood that anyone subjected to numerous punches, kicks, and taser shocks would exhibit rapid physical deterioration. That was the purpose of those punches, kicks, and shocks — to incapacitate Jackson. It also bears mention that it was during this few minutes of rapid transformation that the officers cuffed Jackson’s hands behind his back, disabling him further.
Even assuming that Officer Wilkins did believe that Jackson could not actually walk, sit, or stand up, and accepting that one reason for this could have been Jackson’s internal injury, this is but one possible reason. Jackson had just fled from police and resisted arrest, crashed a car, engaged in a lengthy fight with two police officers, been manhandled and tased multiple times, and had his hands cuffed behind his back. Jackson was clearly intoxicated and gasping for breath. It would not be unreasonable for Officer Wilkins to have attributed Jackson’s inability to stand up to his exhaustion, intoxication, hands being cuffed behind his back, or passive resis-tence. As the district court put it: “Jackson’s difficulty in standing up and getting into the police vehicle would not seem extraordinary given the alley tussle and the fact that Jackson was handcuffed behind his back.”

5. Jackson had a violent collision with a dumpster.

The majority points to Officer Wilkins’s knowledge of Jackson’s violent collision with the dumpster arm as proof that Officer Wilkins knew that Jackson was at substantial risk of a life-threatening injury. There is no dispute that Officer Wilkins knew of this violent collision[4] — in fact, *330 while still at the scene, Officers Wilkins and Blaskie determined that the deep bruise on Jackson’s chest was most likely the result of this collision. R. 121-4 p. 27-28, 26:19-27:12. But knowing of the collision — no matter how violent — is far from knowing that the collision caused a life-threatening injury. If the collision had incapacitated Jackson, then a case could be made that Officer Wilkins should have known that Jackson was severely injured, but the collision did not incapacitate Jackson. Rather, there was no basis for Officer Wilkins to suspect that the collision had caused a serious injury and no evidence to show that Officer Wilkins actually thought so. Far from being an obvious indication of a substantial injury, Jackson made it appear “obvious” that it was not.
After running into the dumpster and flipping over backwards, Jackson jumped up immediately, took off running, and then continued a relentless fight with two officers. Officers Blaskie and Wilkins chased him, tased him, wrestled him down, kneed him in the back and legs, hit and kicked him, and tased him even more, 12 times in all. Officer Wilkins told the Michigan State Police investigator that Jackson was “abnormally strong even with both of them fighting with him.” R. 121-2 p. 14. Officer Blaskie reported that Jackson was “stronger than anyone he has ever fought with before,” and the blows and kicks they gave Jackson “had no effect.” R. 121^1 p. 16; see also R. 121-3 p. 16-19, 56:25-68:16 (Blaskie depo.). They were describing Jackson’s prowess after his collision with the dumpster arm. At deposition, both officers testified to the following:
Question: All right.' When, until the time you got handcuffs on Mr. Jackson, did he ever stop struggling?
Officer Blaskie: No.
R. 121-3 p. 22-23, 81:25-82:2 (Blaskie depo.).
Question: Did Mr. Jackson ever stop fighting and resisting until he was in cuffs?
Officer Wilkins: No.
R. 121^4 p. 29, 28:17-19 (Wilkins depo.).
To repeat, this running, fighting, and resisting happened after Jackson’s collision with the arm of the dumpster. Given these circumstances, there was no basis for Officer Wilkins — or anyone — to suspect that this collision had caused a serious, life-threatening injury to Jackson.

6. Jackson was not so drunk that he could not run or fíght.

The majority rejects Officer Wilkins’s explanation that he thought Jackson’s submission and physical deterioration were due to his severe intoxication rather than a serious injury, on the basis that Jackson’s intoxication was consistent throughout. In this sense, this is just a reiteration of the rapid-physical-transformation claim above, which has already been discussed fully.
In another sense, however, it bears mention that Jackson was severely intoxicated. Jackson’s blood alcohol content (BAC) at his autopsy was 0.17, which is presumably reflective of his BAC at the time of his death, and suggests that his BAC was even higher at the time of his arrest some four hours earlier. This is consistent with Imogene Wade’s (Jackson’s girlfriend’s) statement to the Michigan State Police investigator that Jackson had been “drinking throughout the day” and had “consumed quite a bit,” R. 121-2 p. 37, and the audio recording from Officer Alsup’s *331 dash — cam at the time of the arrest, in which Jackson was badly slurring his words. R. 122^1. Unlike the majority, I would not find it unreasonable that the physical condition of a man with a 0.17-or-greater BAC would deteriorate rapidly after running from the police, fighting with two police officers, and being tased 12 times. I cannot conclude that Jackson’s ability to run and fight despite his intoxication is proof of an intervening serious injury when there were so many other intervening factors.
To summarize this part of the test, the plaintiff has not pointed to any facts to demonstrate that Officer Wilkins subjectively drew the inference that Jackson was at a substantial risk of a serious medical need. Nor do the present facts demonstrate a risk so obvious and substantial that a reasonable juror could conclude that Officer Wilkins must have drawn the inference. I agree with the district court that the plaintiff failed to allege sufficient facts to satisfy this part of the test.
C.
Finally, the plaintiff must allege facts which, if true, would show that the defendant consciously disregarded the known risk and did so with a “deliberateness tantamount to intent to punish.” See Miller, 408 F.3d at 813; Comstock, 273 F.3d at 703 (“Emphasizing the subjective nature of this inquiry, ... an official’s failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment.”).[5] I believe that the plaintiff has fallen far short of such a showing in this case.
The majority identifies five (5) actions, or rather inactions, by Officer Wilkins that demonstrate, in its view, Officer Wilkins’s infliction of punishment on Jackson:
1. “[Officer] Wilkins allegedly allowed Jackson to lie in the back of [Officer] Alsup’s car for 40 minutes without trying to help him.”[6]
2. “[Officer] Wilkins did not ‘make immediate medical treatment available’ to Jackson.”[7]
*332 3. “None of the officers[, including Officer Wilkins,] monitored Jackson while they searched the accident scene.”[8]
4. “[Officer] Wilkins also failed to tell [Officer] Alsup about Jackson’s collision with the dumpster arm.”[9]
5. “[Officer] Wilkins then repeated this mistake [i.e., failed to tell about the collision with the dumpster arm] at the Berrien County Jail.”[10]
If we accept these five accusations as true and assume that Officer Wilkins did fail to fulfill all (or any) of these five duties, then the plaintiff has stated a color-able claim for negligence. Of course, as has been oft repeated here and elsewhere, deliberate indifference requires more than mere negligence. See Comstock, 273 F.3d at 707 (“an inadvertent failure to provide adequate medical care ... would entitle [the officer] to qualified immunity”); Smith v. County of Lenawee, 505 Fed.Appx. 526, 533 (6th Cir.2012) (“deliberate indifference is not mere negligence”); Watkins v. City of Battle Creek, 273 F.3d 682, 686 (6th Cir.2001) (same); Miller, 408 F.3d at 813.
Unless the plaintiff can point to some more egregious conduct by Officer Wilkins or evidence of Officer Wilkins’s actual motive with regard to his actions, I cannot conclude that Officer Wilkins acted with the requisite mental state necessary to show that he was deliberately indifferent. Qualified immunity protects Officer Wilkins against such mere negligence claims. See, e.g, Williams v. Sandel, 433 Fed.Appx. 353, 363 (6th Cir.2011). It should do so here.
III.
In summary, I would affirm the district court’s orders granting qualified immunity to all of the defendants in this case, including Officer Wilkins. Because I cannot agree with the majority’s findings or analysis concerning Officer Wilkins, I respectfully dissent from Section II.B.l of the majority’s decision. I otherwise concur in the majority’s judgment.

1. Based on the context of this passage, the district court’s omission of the word "not” was presumably a typographical error, and the court meant to write that "Jackson himself stated that he did not need to go to a hospital.” All three officers asserted that Jackson stated that he did not need to go to file hospital. R. 121-2 p. 14, 16, 19, 34; 121-4 p. 21, 20:15-18, 27:22-28:9; 122-3 p. 22, 80:16-81:8, 82:19-83:2, 88:4-25. On the other hand, there is no evidence that Jackson stated that he did need to go to the hospital, nor did the plaintiff contend that Jackson stated as much.

. At least one of the inmates interviewed by the Michigan State Police investigator stated that a jail deputy had told him that he thought Jackson had overdosed on drugs. R. 121-2 p. 44. None mentioned any internal injury.

. The plaintiff submitted four expert opinions, none of which asserts that an inability to stand up is a symptom of a life-threatening internal injury, such as an internal liver laceration. See R. 134-5 (Dragovic Report); 135-1 (Behrens-Hanna Report); 135-2 (Peters Report); 135-3 (Mehlman Report). And, as it turns out, no one involved in this case ever drew that inference; not the other officers, the jail deputies, the jail nurse, the EMTs, or the emergency room staff.

. The majority attacks Officer Wilkins’s testimony that he did not actually see Jackson collide with the dumpster, writing that "Wilkins disputes that he actually saw Jackson’s collision with the dumpster arm,” but "Wilkins was close behind Blaskie” and "Blaskie admits to seeing the collision.” Maj. Op., supra. But Officer Blaskie did not admit to seeing the collision. R. 121-2 p. 15. In three separate places in his deposition, Blaskie testified that he did not actually see Jackson run into the dumpster, R. 121-3 p. 15, 53:23-24 ("I didn't know what exactly happened to cause [the backflip].”); p. 16, 55:15-19 ("unknown object”); p. 21, 74:17-20 ("Q. Did you ever see him come into contact with the dumpster? A. I saw him come into contact with something — at the time that it happened, I didn't know what it was but once I went back to the area where it happened, I realized what it was.”). Officer Blaskie testified that he and Officer Wilkins figured it out, p. 21, 76:6-8 ("After going back and looking at the area and from what I had seen during the incident, I concluded that he ran, as he turned the comer he ran into the, into the dumpster.”); p. 22, 78:16-21 ("At some point while we were at the scene we noticed bruising ... [and] we made the conclusion that that was the part of the dumpster that he hit.”). Officer Wilkins testified consistently. R. 121-4 p. 27-28, 26:19-27:12 ("Q. Did you see him go into the dumpster? A. I saw him cut around the corner and then come back out, and then as I — because [Jackson and Officer Blaskie] were a little bit further ahead of where I was at.... Q_You said ... you saw [Jackson] go backwards_ A. Right. And then as I come up to the corner, I saw there was a dumpster immediately there so — . Q. You just put two and two together? A. Right.”). Officer Wilkins told the Michigan State Police investigator that Jackson ran into the dumpster, and though he did not see it himself (he was behind Officer Blaskie), he acknowledged that he was aware that Jackson had run into the dumpster. R. 121-2 p. 13. Officer Alsup stated that it was "very dark” in the alley at the location of the dumpster, R. 122-3 p. 19, 67:17-68:7, and Officer Blaskie said it was "pitch black,” R. 121-2 p. 16. To summarize: Officer Wilkins acknowledged that he knew, while at the scene, that Jackson had a violent collision with the dumpster, one which left a severe braise. The majority inaccurately portrays Officer Wilkins as untruthful *330 as support for its assertion that a jury would disbelieve him. This appears to me to be unnecessary and improper.

. As the Supreme Court articulated in Farmer, a case about the risk underlying a prison official’s decision to house an effeminate, trans-gender male in the general population of a men’s prison:
In ... situations[] where the decisions of [the] officials are typically made in haste, under pressure, and frequently without the luxury of a second chance, an Eighth Amendment claimant must show more than ‘indifference,’ deliberate or otherwise. The claimant must show that officials [acted] maliciously and sadistically for the very purpose of causing harm, or, as the Court also put it, that officials [acted] with a knowing willingness that harm occur.
Farmer, 511 U.S. at 835-36, 114 S.Ct. 1970 (quotation marks, editorial marks, and citations omitted).

. It is interesting that the plaintiff did not investigate or raise this particular claim in the district court. Plaintiff’s counsel deposed Officers Wilkins, Blaskie, and Alsup (as well as the chief of police, several jail deputies, and the jail nurse), but never questioned any of them as to why Jackson was left in the back of Officer Alsup’s patrol car for 40 minutes. In fact, not only did plaintiff’s counsel never ask why they waited 40 minutes, the general topic of Jackson’s waiting (even the 25-30 minutes that Officer Wilkins estimated) at the scene was never raised. Rather, plaintiff's counsel questioned why Officer Wilkins transported Jackson to the jail rather than to the hospital. Officer Wilkins answered that question four times during his deposition, explaining that he took Jackson to jail at the instruction of Officer Alsup, his shift supervisor and the officer in command. R. 121-4 p. 21, 20:7-12; p. 22, 21:20-22:2; p. 25, 24:10-14. Officer Alsup also testified that it was his on-scene decision to send Jackson to jail rather than to the hospital. R. 122-3 p. 23, 82:7-20.

.See note 6, supra. Officers Wilkins and Alsup both testified that it was Officer Alsup’s decision to send Jackson to jail rather than *332 the hospital. R. 121-4 p. 21, 20:7-12; p. 22, 21:20-22:2; p. 25, 24:10-14; R. 122-3 p. 23, 82:7-20.

.This is simply contrary to the evidence in the record. All three officers (Wilkins, Bla-skie, and Alsup) told the Michigan State Police investigator that they did, in fact, monitor Jackson. Officer Wilkins told the investigator, "yes, [Jackson] was checked on several times and each time he was sitting in a different position." R. 121-2 p. 14-15. Officer Blaskie told the investigator the same. R. 121-2 p. 16. Officer Alsup told the investigator that he "looked in on” Jackson and at one point helped Jackson reposition himself. R. 121-2 p. 19. Only Officer Wilkins touched on this topic at his deposition, in which he said that he and Alsup were outside the car talking with Jackson. R. 121-4, 23:9-15.

. Note that Jackson himself also failed to tell Officer Alsup about his collision with the dumpster arm, even though Jackson was conversant and actually conversing with Officer Alsup.

. Note that Jackson also failed to tell anyone at the Berrien County Jail about his collision with the dumpster arm, even though Jackson was conversant upon arrival and placement in the cell.