NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0641n.06

No. 11-1378

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jun 18, 2012*

LEONARD GREEN, Clerk

JASON P. CAIE,

    Plaintiff-Appellant,

v.

WEST BLOOMFIELD TOWNSHIP, a Michigan
municipal corporation; WEST BLOOMFIELD
TOWNSHIP POLICE DEPARTMENT; RONALD D.
CRONIN; ZENA DAILEY; ERIK TILLI; C.
KOZIARSKI; WEST BLOOMFIELD TOWNSHIP
FIRE DEPARTMENT; JAMES POPPELREITER;
STEVE LEWIS,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

Before: KEITH, MCKEAGUE, and DONALD, Circuit Judges.

BERNICE BOUIE DONALD, Circuit Judge. This case arises from defendant Erik Tilli's

use of an electrical stun-gun, or taser, on Plaintiff-Appellant Jason Caie ("Plaintiff") while

attempting to secure Plaintiff and take him to a hospital for a mental health evaluation. Plaintiff later

filed suit pursuant to 42 U.S.C. § 1983, alleging that Tilli's use of the taser constituted excessive

force in violation of his Fourth and Fourteenth Amendment rights. The district court granted

summary judgment in favor of the defendants, and Plaintiff timely appealed. Because we find that

Tilli's use of the taser did not violate Plaintiff's constitutional rights, we **AFFIRM**.

## I. BACKGROUND[1]

At approximately 2:40 a.m. on August 2, 2009, officers with the West Bloomfield Township Police Department responded to a request for a welfare check on Plaintiff, then nineteen years old, who was reportedly depressed, intoxicated, and suicidal. Plaintiff had attempted suicide several times in the past and was under a psychiatrist's care. On the night in question, Plaintiff had consumed three-and-a-half bottles of wine and snorted Paxil, a drug prescribed by his psychiatrist. Plaintiff called his brother, Scott, crying and told Scott that he was drunk, had taken some pills, and that he intended to kill himself. Plaintiff planned to row out to the middle of the lake near his parents' home and drown himself.

Concerned for Plaintiff's safety, Scott and a friend, Brandon McCarthy, drove to Plaintiff's parents' home where they unsuccessfully attempted to talk to Plaintiff and take him to the hospital. Plaintiff was behaving irrationally and repeatedly tried to "get away," both on foot and by attempting to drive away in his car. Eventually, Scott and Mr. Caie, Plaintiff's father, took Plaintiff into the house and put him to bed. Believing the situation to be under control, Brandon left the Caie residence and returned home, leaving Scott and Mr. Caie to tend to Plaintiff. A short time later, however, Scott called Brandon to report that Plaintiff had managed to escape, apparently through the bedroom window. Brandon called the police, explained the situation, and requested assistance.

---

[1] The material facts in this case are not disputed. They are drawn from the depositions of Officers Dailey, Tilli, and Koziarski, witness Brandon McCarthy, and, to a limited extent, Plaintiff himself. While Plaintiff was able to testify competently about certain portions of the events of August 2, 2009—namely, his consumption of alcohol and drugs, his state of emotional turmoil, and his intent to commit suicide—he acknowledges having little or no memory of the events that occurred after police arrived on the scene.

In response to Brandon's call to police, Officer Zena Dailey and Sergeant Erik Tilli were dispatched to the Caie residence. The officers had been advised that an intoxicated, suicidal subject was in a rowboat in the middle of the lake. Upon arriving at the scene, Dailey observed on the lake an empty rowboat and a paddle boat with two occupants. Dailey called out to the occupants of the paddle boat, who identified themselves as Plaintiff's brother and father. They indicated that they could not find Plaintiff but that his cell phone and shoes were in the rowboat. After an initial search of the area, Dailey saw someone in the water, whom she assumed to be Plaintiff, and requested that he come to shore.

Plaintiff, who was now approximately fifteen feet from shore and submerged chest-deep in the water, was initially uncooperative with Dailey's requests to come out of the water. Plaintiff repeatedly told the officers that he wanted to die and asked what he would have to do to get them to shoot him. Plaintiff also mused aloud that he should fight the officers so that they would have a reason to kill him. Eventually, Plaintiff complied with the officers' requests, came out of the water, and sat down on the ground.

Once on shore, Plaintiff continued to behave erratically. He made additional comments about fighting the police and stated that "he should have said he had a gun in his back so [the police] could . . . kill[] him." Plaintiff also exhibited dramatic mood swings, ranging from "sad and crying and upset" one minute to "hostile and violent and threatening" the next. By this time a third police officer, Christina Koziarski, as well as several members of the fire department, had arrived on the scene. The officers attempted to calm Plaintiff and get him to go voluntarily with the firemen to be transported to the hospital, but Plaintiff would not comply. After Plaintiff continued to be

noncompliant for several minutes, Tilli signaled to the other officers that they were going to have to take physical control of Plaintiff in order to transport him to the hospital.

Concerned that Plaintiff's resistance could escalate into a violent confrontation, Tilli unholstered his taser. When the officers moved in to gain control of Plaintiff, Plaintiff began to run while flailing his arms violently. Officers Dailey and Koziarski attempted to grab Plaintiff but were unable to secure him. Tilli shot his taser, but the probes missed Plaintiff. The officers eventually took Plaintiff to the ground. They repeatedly ordered Plaintiff, who was laying on the ground with his arms underneath his body, to move his hands behind his back so that they could handcuff him. Plaintiff did not comply. Tilli removed the probes from his taser and applied the taser once in drive-stun mode to the left side of Plaintiff's back. In response, Plaintiff moved his arms from underneath his body and allowed officers to handcuff him. The officers then assisted Plaintiff to his feet and escorted him to an ambulance for transport to the hospital.

On November 18, 2009, Plaintiff filed a complaint in federal court alleging, among other things, that Tilli's use of the taser constituted excessive force that deprived Plaintiff of his rights under the Fourth and Fourteenth Amendments. On November 1, 2010, the remaining defendants filed a motion for summary judgment, to which Plaintiff timely responded. The district court heard oral argument on the motion and on February 23, 2011, granted the motion, dismissing Plaintiff's claims with prejudice. Plaintiff timely appealed.

## II. ANALYSIS

### A. Standard of Review

We review the district court's summary judgment ruling de novo. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008). Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The reviewing court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *White*, 533 F.3d at 390. Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment. *Id.* The disputed fact must be supported by evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Niemi v. NHK Spring Co., Ltd.*, 543 F.3d 294, 298 (6th Cir. 2008). Moreover, for purposes of summary judgment, a disputed fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Id*. at 298-99.

### B. Excessive Force

Claims that law enforcement officers used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests and the countervailing governmental interests at stake." *Id.* at 396 (quotation marks and internal citations omitted). Courts must consider the totality of the circumstances in each

particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

In addition, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the benefit of hindsight. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). In other words, courts must take into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. Ultimately, however, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978); *Terry*, 392 U.S. at 21).

As to the use of tasers specifically, the Sixth Circuit has stated that "absent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm—the use of [a stun gun] *on a non-resistant* person is unreasonable." *Kijowski v. City of Niles*, 372 F. App'x 595, 600 (2010) (emphasis added). Conversely, the Sixth Circuit has looked with favor on at least one decision from another circuit that found that "it was not excessive for officers to use an 'electrical stun gun' on a man after grabbing him and wrestling him to the ground" where

the subject was still actively resisting arrest. *Id.* (quoting *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007)).[2]

In the instant case, the district court found that "there was, undisputedly, enough resistance on the part of the Plaintiff" to justify Tilli's use of force. In particular, the court found that Plaintiff's attempt to run away and his failure to cooperate in allowing officers to handcuff him were sufficient to justify the use of a taser to gain Plaintiff's compliance. On appeal, Plaintiff argues that the use of force was unreasonable because he was not being arrested for a crime and because, at the time Tilli used the taser, Plaintiff was subdued, not attempting to flee, and posed no physical threat to the officers or anyone else. The officers counter that, in addition to being intoxicated and suicidal, Plaintiff was threatening, unstable, and uncooperative. He spoke of provoking the officers into using deadly force against him and tried to flee when they attempted to secure him. Even after officers successfully subdued Plaintiff by taking him to the ground, he remained uncooperative, pulling his arms underneath his body and refusing to allow the officers to handcuff him.

---

[2] Also instructive are the cases from district courts within the Sixth Circuit that have expressly found an officer's single use of a taser objectively reasonable under factually similar circumstances. *See, e.g.*, *Alexander v. City of Shelby Twp.*, No. 07-cv-14741, 2009 WL 3241974 (E.D. Mich. Oct. 8, 2009) (holding that officer's single use of taser in drive-stun mode was not unreasonable where plaintiff refused to obey repeated orders to enter patrol car and where plaintiff previously displayed "belligerent" and "threatening" behavior); *Wylie v. Overby*, No. 05-CV-71945-DT, 2006 WL 1007643 (E.D. Mich. April 14, 2006) (holding that use of taser in dart mode was not excessive force because of plaintiff's "assaultive tactics" in resisting arrest and his attempts to evade arrest); *Devoe v. Rebant*, No. 05-71863, 2006 WL 334297 (E.D. Mich. Feb. 13, 2006) (holding that police officer did not use excessive force when he administered taser in drive-stun mode to arrestee's lower back when arrestee failed to comply with police commands to get into police car).

Considering the factors enunciated in *Garner*, Tilli's single use of the taser in drive-stun mode did not violate Plaintiff's constitutional rights. While it is true that Plaintiff was not being arrested for a crime, his consumption of a large quantity of alcohol and drugs, his erratic behavior, and his self-proclaimed desire to provoke the officers into using deadly force could lead reasonable officers to conclude that he was a threat to officer safety. Plaintiff admits that he was suicidal, meaning that, at a minimum, he was a threat to his own safety. In addition, Plaintiff's attempts to flee—including getting behind the wheel of his car and trying to drive away—undoubtedly posed a risk of harm to others with whom he might come into contact. Tilli had every reason to believe that, in his highly agitated, suicidal, and intoxicated state, Plaintiff was potentially dangerous.

Moreover, the fact that Plaintiff was taken to the ground and arguably "subdued" when Tilli employed the taser does not, as Plaintiff argues, compel the conclusion that Tilli's use of force was unreasonable. Although Plaintiff insists that he no longer posed a risk of harm or flight after being taken to the ground, there is no dispute that Plaintiff continued to be uncooperative by actively resisting the officers' attempts to secure his arms behind his back. In light of this resistance, we find that Tilli's single use of the taser in drive-stun mode was not gratuitous. Rather, it served the purpose of gaining control over a highly intoxicated, volatile, and uncooperative subject and neutralizing what a reasonable officer could perceive as a dangerous situation. We find that Tilli's use of force under these circumstances did not violate Plaintiff's constitutional rights.[3]

---

[3] Because we find no constitutional violation, we need not discuss the defendants' argument that they are entitled to qualified immunity.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.