BERNICE BOUIE DONALD, Circuit Judge,
concurring only in the judgment.
I concur in the majority’s characterization of the legal standard and the circumstances under which qualified immunity is appropriate. That determination is driven by the facts. The majority uses words to evoke a scenario that would satisfy the first prong of the qualified-immunity standard. Indeed, words have power. In my view, the facts in this case — properly construed in Lawrence Carpenter’s favor — did not justify the level of force employed by the officers. However, in light of the Supreme Court’s recent heightening of the second prong of the qualified-immunity standard, I agree with the majority that the officers in this case are entitled to qualified immunity. Because I would hold that the officers’ nearly immediate resort to the use of a taser constituted excessive force, I concur only in the judgment.
I.
At the summary-judgment stage, we must view the evidence in the light most favorable to the non-moving party. Shreve v. Franklin Cnty., Ohio, 743 F.3d 126, 132 (6th Cir.2014). That principle applies with equal force to the dash-cam videos at issue in this case. The majority asserts that we must “ ‘view[ ] the facts in the light depicted by the videotape[s].’ ” Maj. Op. at 639 (alterations in original) (quoting Scott v. Harris, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). In my view, the majority overreads Scott, which stands only for the proposition that a court need not accept a plaintiffs version of the facts if it is “blatantly contradicted by [a videotape], so that no reasonable jury could believe it.” 550 U.S. at 380, 127 S.Ct. *645 1769. In other words, only where an “unambiguous video recording” indicates that there is no triable issue, Shreve, 743 F.3d at 132, should the traditional weighing of inferences in favor of the non-moving party give way to video evidence. See id. at 143 (Clay, J., dissenting) (arguing that a panel must accept the non-moving party’s interpretation of a video where “a reasonable jury could believe [the non-moving party] after viewing the video in evidence”). With this in mind, a brief summary of the facts follows.
II.
On the afternoon of February 8, 2010, as Deputy Brandon Gillispie drove eastbound on Route 55 in Wellston, Michigan, he observed a person, known to him as Lawrence Carpenter, driving a truck going the opposite direction. Based on a prior encounter, Gillispie surmised that Carpenter was driving on a suspended license. Gillis-pie made a U-turn, activated his blue lights, and pulled Carpenter over. The relevant encounter captured by Gillispie’s dash-cam video — from the time Gillispie approached Carpenter’s vehicle until the time Carpenter was tasered — lasted for a total of approximately 26 seconds. See R. 30 (Gillispie Dash-Cam Video) at 13:17:25-13:17:51.
Gillispie approached the subject vehicle and told Carpenter that he was under arrest for driving on a suspended license. Gillispie immediately opened the driver’s-side door of Carpenter’s truck and ordered him to exit the vehicle. Id. at 13:17:25. Carpenter complied.[1] Id. at 13:17:33. Gillispie testified that he then instructed Carpenter to place his hands on the bed of the truck, but that Carpenter refused. R. 28-1 (Gillispie Dep.) at Pa-gelD 150. According to Gillispie, Carpenter “didn’t verbally refuse[,].... but he refused to comply and put both hands on the back of the truck as I asked him to do.” Id. Carpenter’s testimony tells a slightly different story. According to Carpenter, “[Gillispie] tried to turn me around and lean up against the truck and wanted me to put my hands behind my back....” R. 28-1 (Carpenter Dep.) at PageID 137. Gillispie’s dash-cam video, which did not capture an audio recording of the exchange between Carpenter and Gillispie, does not confirm the veracity of either party’s version of this portion of the encounter. Of note, it does not confirm that Gillispie informed Carpenter to place his hands on the bed of the truck, or, as the majority contends, that “Carpenter did not listen.” Maj. Op. at 640. Moreover, although the majority readily accepts Gillis-pie’s testimony on this point as true, the video does not confirm that “Carpenter appeared ‘highly agitated’ and was ‘swearing’ in response to this request.” Id.
In any event, the video captures Gillispie grabbing Carpenter’s right arm as Carpenter gripped the bed of his truck with his left arm. R. 30 (Gillispie Dash-Cam Video) at 13:17:36-13:17:38. Carpenter jerked his right arm away from Gillispie’s grip.[2] Id. Gillispie ultimately was able to get both of Carpenter’s hands on the bed of the truck, id. at 13:17:40, to which Car *646 penter “hung on.” R. 28-1 (Carpenter Dep.) at PagelD 141. According to Carpenter, “[Gillispie] said, Well, put your arm behind your back, and I told him I wasn’t going to. I said, Just let me go and I will take my time and I will do it, but he wouldn’t do it....” Id. As Gillispie continued to grip Carpenter’s arms, Carpenter jerked his left arm away and continued to grasp the bed of his truck. R. 30 (Gillispie Dash-Cam Video) at 13:17:44.
The dash-cam video of another responding officer, Deputy Jacob Bielski, captured audio of this latter portion of the encounter. See R. 30 (Bielski Dash-Cam Video). Gillispie twice said to Carpenter, “give me the hands now.” Id. at 13:13:46-13:13:49. When Carpenter refused to let go of the bed of his truck, Gillispie delivered a knee strike to Carpenter’s left knee. R. 30 (Gillispie Dash-Cam Video) at 13:17:49. Bielski said, “relax, or you’re gonna get tasered.” R. 30 (Bielski Dash-Cam Video) at 13:13:50-13:13:52. One second later, Bielski said, “taser, taser, taser,” id. at 13:13:53, and instantaneously shot Carpenter with his taser one time. R. 28-3 (Biel-ski Dep.) at PageID 165; R. 30 (Gillispie Dash-Cam Video) at 13:17:50. Carpenter then slumped onto the ground, where Gillispie was able to place him in handcuffs. R. 30 (Gillispie Dash-Cam Video) at 13:17:50-13:18:16. The officers then helped Carpenter to his feet and placed him in the back of Gillispie’s cruiser. Id. at 13:18:55-13:19:30. Again, the relevant encounter in this case lasted less than 30 seconds.
III.
The majority’s statement of the law regarding excessive force in the context of the use of tasers is accurate. Courts review excessive-force claims on a case-by-case basis and consider the totality of the circumstances in each particular case, including “the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citing Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). We have held that “[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him.” Hagans v. Franklin Cnty. Sheriff’s Office, 695 F.3d 505, 509 (6th Cir.2012). We also have held that non-compliance does not constitute active resistance unless it is paired with other active signs of resistance, such as verbal hostility. Eldridge v. City of Warren, 533 Fed.Appx. 529, 535 (6th Cir.2013); Harris v. City of Circleville, 583 F.3d 356, 366 (6th Cir.2009).
The problem here is the majority’s application of the correct legal standard, which relies on factual inferences imper-missibly drawn in the officers’ favor. For example, in concluding that Carpenter actively resisted arrest “[n]o matter how you cut it,” the majority asserts that Carpenter was “verbally defiant.” Maj. Op. at 642. But that fact is plucked straight out of Gillispie’s deposition testimony and is not confirmed anywhere else in the record. See id. at 640 (citing R. 28-2 (Gillispie Dep.) at PageID 149). Similarly, the majority emphasizes that Carpenter “twice swung his arms in the officer’s direction.” Id. at 642. But this is merely two appellate judges’ interpretation of the video; it would not be unreasonable for a jury to conclude that Carpenter simply jerked his arm away from Gillispie, rather than full-on “swinging” it in his direction.. See supra at 645 n. 2. The majority’s conclusion that “a reasonable jury applying the law of our circuit could conclude only ” that Car *647 penter actively resisted arrest, Maj. Op. at 642 (emphasis added), depends on the premise that Carpenter’s “noncompliance was ‘paired with [ ] signs of verbal hostility or physical resistance[.]’ ” Id. at 642 (quoting Eldridge, 533 F. App’x at 535). Because that premise rests on factual inferences impermissibly drawn from the opposing party’s testimony and against the non-moving party, I would affirm the judgment of the district court.
A brief survey of our case law upholding taser stuns on resisting suspects — much of which the majority cites for support — demonstrates that Carpenter’s case is distinguishable. Put simply, a jury could reasonably find that Carpenter’s resistance to Gillispie was too de minimis to justify the level of force used.[3] In Hagans, officers confronted and tased a suspect who fled on foot, attempted to open the locked driver’s-side door of a police cruiser, and, after officers had wrestled him to the ground, “locked his arms tightly under his body [to resist being handcuffed], kicking his feet and continuing to scream.” 695 F.3d at 507. In Caie v. West Bloomfield Township, officers encountered a highly intoxicated, suicidal suspect who threatened the officers and, upon their approach, “began to run while flailing his arms violently.” 485 Fed.Appx. 92, 94 (6th Cir.2012). Officers tased the suspect only after wrestling him to the ground and after repeated requests for him to remove his hands from underneath his body in order to be handcuffed. Id. In Williams v. Sandel, officers pepper sprayed and repeatedly tased — to little effect — a suspect who was high on ecstasy, jogging naked along an interstate, and struggling to escape from officers after they had successfully handcuffed only one of his arms. 433 Fed.Appx. 353, 354-56 (6th Cir.2011). In Williams v. Ingham, officers tased a suspect who led them on a high-speed chase through a residential area, struggled with an officer attempting to remove him from his vehicle (breaking the officer’s finger in the process), and refused to remove his hands from underneath his body after being wrestled to the ground. 373 Fed.Appx. 542, 548 (6th Cir.2010). None of these cases is on all fours with Carpenter’s far-less-dramatic behavior.[4] The officers’ use of a taser on Carpenter in these circumstances constituted excessive force.
IV.
The second prong of the qualified-immunity inquiry, however, shields officers from trial unless they “violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.” Reichle v. Howards, — U.S. -, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). In its recent pronouncements on qualified immunity, the Supreme Court arguably has heightened the standard to clarify that a right is clearly established if it is “sufficiently clear ‘that every reasonable official would [have understood] that *648 what he is doing violates that right.’ ” Id. (alteration in original) (emphasis added) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2078, 179 L.Ed.2d 1149 (2011)) (internal quotation marks omitted). Prior case law merely required a right to be “sufficiently clear that a reasonable official would understand that what he is doing violates that right” — not every reasonable official. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (emphasis added). Nor was any identical case required to be on point: “officials can still be on notice that their conduct violates established law even in novel factual circumstances.” Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); see also Goodwin, 781 F.3d at 325 (“[TJhere need not be a case with the exact same fact pattern or even fundamentally similar or materially similar facts; rather, the question is whether the defendants had fair warning that their actions were unconstitutional.” (alteration in original) (quoting Cummings v. City of Akron, 418 F.3d 676, 687 (6th Cir.2005)) (internal quotation marks omitted)). Now, however, the law at the time of the officers’ conduct must have placed the constitutional question “beyond debate.”[5] Stanton v. Sims, — U.S. -, 134 S.Ct. 3, 5, 187 L.Ed.2d 341 (2013) (per curiam) (quoting al-Kidd, 131 S.Ct. at 2083) (internal quotation marks omitted).
Here, as demonstrated by my disagreement with the majority regarding the constitutionality of the officers’ use of a taser in this scenario, the constitutional question is not — as it must be — “beyond debate.” al-Kidd, 131 S.Ct. at 2083. I would hold that the officers’ practically immediate resort to the use of a taser in this 26-second encounter violated Carpenter’s Fourth Amendment right to be free from the use of excessive force. But because the question is debatable, it cannot be said that the officers’ mistaken belief in the justification of their actions signals that they are “plainly incompetent” or “knowing!] vio-lat[ors of] the law.” Id. at 2085 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)) (internal quotation marks omitted).
Accordingly, I concur only in the judgment.

. Although Carpenter testified that Gillispie "jerked” him out of the truck, the video evidence contradicts that portion of his testimony. Compare R. 28-1 (Carpenter Dep.) at PageID 137, with R. 30 (Gillispie Dash-Cam Video) at 13:17:33. Accordingly, we need not accept it as true. Scott, 550 U.S. at 380, 127 S.Ct. 1769.

. The majority characterizes Carpenter's motion as a "sw[i]ng ... in Gillispie’s direction.” Maj. Op. at 640. A jury watching the video could reasonably conclude that the motion was far more benign.

. Despite the majority's insistence to the contrary, Maj. Op. at 643, this panel's recognition that excessive force may be actionable where resistance is de minimis wpuld not be a novel concept. Recent, published case law demonstrates as much. See, e.g., Goodwin v. City of Painesville, 781 F.3d 314, 328 (6th Cir.2015) (recognizing with approval a prior Sixth Circuit case holding "that the officers' force was far in excess of what the [plaintiff’s] minimal resistance ... justified" (citing Shreve v. Jessamine Cnty. Fiscal Court, 453 F.3d 681, 686-88 (6th Cir.2006)) (emphasis added)).

. As Carpenter argues, a jury could reasonably conclude that, given the short duration of the encounter, "[Carpenter] did not have time to comply with [Gillispie's] order before [Bielski] used his Taser.” See Austin v. Redford Twp. Police Dep’t, 690 F.3d 490, 498 (6th Cir.2012).

. While the Supreme Court may have "virtually ignored” the "fair warning” standard set forth in Hope in its al-Kidd decision, see Karen Blum, Erwin Chemerinsky, & Martin A. Schwartz, Qualified Immunity Developments: Not Much Hope Left for Plaintiffs, 29 Touro L.Rev. 633, 654 (2013), it did not expressly overrule (or even mention) it. See al-Kidd, 131 S.Ct. at 2086-87 (Kennedy, J., concurring) (noting that the qualified-immunity standard "ensure[s] the officer has 'fair and clear warning’ of what the Constitution requires.” (quoting United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997))). Lower courts have recognized this "puzzling” silence. Morgan v. Swanson, 659 F.3d 359, 373 (5th Cir.2011) (en banc).