NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 16a0242n.06

Case No. 15-4085

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| MATTHEW D. KELLY, | ) | **FILED** |
|  | ) | May 06, 2016 |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE UNITED |
|  | ) | STATES DISTRICT COURT FOR |
| CLINTON E. SINES; SHERIFF VERNON P. | ) | THE SOUTHERN DISTRICT OF |
| STANFORTH, Fayette County; BRYAN | ) | OHIO |
| COOK, | ) |  |
|  | ) |  |
| Defendants-Appellees. | ) |  |

BEFORE: GUY, BOGGS, and COOK, Circuit Judges.

BOGGS, Circuit Judge. Matthew Kelly was sleeping in the front passenger seat of his friend's pickup truck when the police ordered the truck to pull over. After Kelly made a swiping motion at an officer's head, another officer fired his taser at Kelly. One of the taser darts hit Kelly in his right eye, leaving him blind in that eye. Kelly sued the officers for excessive force under 42 U.S.C. § 1983 and brought a state-law claim for battery against the officer who fired the taser. The district court granted summary judgment to the officers on all claims, and for the reasons discussed below, we affirm.

I

On the morning of May 25, 2013, Matthew Kelly was riding in his friend Justin Runck's pickup truck on I-71 in Ohio. The two had been drinking and smoking marijuana earlier, and

multiple witnesses reported that the truck was being driven erratically. Ohio State Trooper Sergeant Bryan Cook followed the car, and at 3:28 AM he turned on his squad car's police lights, which activated the dash cam.

After Sergeant Cook activated his lights, Runck pulled over to the left of the interstate in the emergency lane by the median. Cook told Runck to get out of the truck and performed several field sobriety tests on Runck, which Runck failed. Cook then arrested Runck for operating a vehicle under the influence and placed Runck in his squad car. While all of this was happening, Kelly was asleep in the front passenger seat of Runck's pickup truck.

As Sergeant Cook was dealing with Runck, Fayette County Deputy Sheriff Clinton Sines arrived on the scene to provide backup. After talking to Sines, Cook said: "If you can just watch him [Runck] for me, I'll go up here and wake up the passenger." Cook went back to the truck to wake up Kelly because the truck needed to be towed. Shining a flashlight into the car, Cook opened the driver-side door and said, "Hey, partner, hey." When Kelly did not wake up, Cook began yelling "Hey!" and rubbing his middle knuckle on Kelly's collarbone—a technique known as a sternal rub. After several seconds, Kelly woke up.

At this point, Kelly made a broad swiping motion with his hands at Sergeant Cook. The dash-cam video shows that Kelly raised both hands over his head and brought them down at Cook's head, and Cook testified in his deposition that Kelly hit the brim of his hat. Cook reacted by recoiling and shouting, "Get up! Hey!"

Kelly then began forcefully attempting to remove his seatbelt—appearing to try to get closer to Sergeant Cook at one point—but he did not succeed; although Kelly pushed the shoulder belt over his head and behind his back, he never unbuckled the lap belt that was around his waist. While Kelly struggled with his seatbelt and flailed in his seat, Deputy Sines ran over

to the passenger side of the truck. Sines opened the door and reached in, appearing to grab Kelly, and yelled, "Show us your hands!" but Kelly continued to flail. Sines then grabbed Kelly by the hood of his sweatshirt and pulled him out of the truck, but the seatbelt prevented Sines from pulling him completely to the ground. As Sines was pulling Kelly out of the truck, he said, "I'll tase you!" Kelly flailed his arms at Sines as he was pulled out. Once he was out of the truck, he put his left hand on the ground and pushed himself onto his feet. At this point, Sines was standing in the middle of the interstate, potentially in the way of oncoming traffic.

When Kelly stood up on his feet, Deputy Sines fired his taser at him. Kelly fell into the passenger seat of the truck and sat there as Sines shouted "Get on the ground!" repeatedly and warned, "I'll do it again!" Kelly did not get on the ground and instead put his hands behind his head. While Sines was yelling at Kelly, Sergeant Cook walked over to the passenger side of the truck and joined Sines, yelling, "It's the police. He said, 'Get on the ground.'" While Kelly was sitting in the passenger seat of the truck, Sines activated his taser for a second time. Sines then tried to pull Kelly out of the truck and onto the ground again, at which point he realized that Kelly was still restrained by his seatbelt. Sines asked, "Has he got a seatbelt around him?" to which Cook replied, "Um, let me see . . . yeah." Cook went back around to the driver's side of the truck and reached in to unbuckle Kelly's seatbelt. The officers handcuffed him shortly thereafter.

A few minutes later, Kelly told Sergeant Cook, "I got something sticking out of my eyelid." Cook responded that a medic would be coming to take a look at it. Paramedics treated Kelly on the scene before he was transported to a hospital for further treatment. One of the taser darts had hit Kelly in his right eye, and as a result, Kelly is now blind in that eye. Kelly sued the officers in the Southern District of Ohio, bringing federal claims for excessive force under

3

42 U.S.C. § 1983 against Cook and Sines and a state-law claim for battery against Sines. The district court granted summary judgment to the officers on all claims, and Kelly now appeals.

II

We review the district court's grant of summary judgment to the officers de novo. *See Gradisher v. City of Akron*, 794 F.3d 574, 582 (6th Cir. 2015). Taking the facts "in the light depicted by the videotape," all reasonable inferences must be drawn in favor of the plaintiff. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). If no rational trier of fact could find for the plaintiff, the defendants are entitled to summary judgment. *Id.* at 380.

III

Kelly argues that Sergeant Cook and Deputy Sines violated his Fourth Amendment right to be free from excessive force. The officers respond that they did not use excessive force and should be granted qualified immunity. Whether a defendant receives qualified immunity turns on two questions: did the defendant violate a constitutionally protected right, and if so, was the right clearly established at the time the act was committed? *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). These questions may be addressed in any order that will facilitate a fair and efficient disposition of the case. *Id.* at 242.

Kelly's Fourth Amendment excessive-force claims turn on the "objective reasonableness" of the officers' actions. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The test of reasonableness "is not capable of precise definition or mechanical application." *Id.* at 396. It requires "careful attention to the facts and circumstances," including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ibid.*

This court's decisions involving the use of a taser have devoted considerable attention to the third factor mentioned in *Graham*: whether the plaintiff was actively resisting arrest. Active resistance includes "physically struggling with, threatening, or disobeying officers." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (quoting *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012)). "If a suspect actively resists arrest . . . officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012); *see also Rudlaff*, 791 F.3d at 641–42; *Williams v. Sandel*, 433 F. App'x 353, 362–63 (6th Cir. 2011); *Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010). On the other hand, when a plaintiff's actions do "not follow the typical course of active resistance," we are more inclined to deny qualified immunity. *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013); *see also Kijowski v. City of Niles*, 372 F. App'x 595, 599–601 (6th Cir. 2010); *Landis v. Baker*, 297 F. App'x 453, 464 (6th Cir. 2008).

A plaintiff's resistance to an officer's commands is relevant even if the officers were not attempting to arrest him. In *Caie v. West Bloomfield Township*, the plaintiff argued that "the [officer's] use of force was unreasonable because [the plaintiff] was not being arrested for a crime." 485 F. App'x 92, 96 (6th Cir. 2012). Even so, we noted that the plaintiff was being "uncooperative by actively resisting the officers' attempts to secure his arms behind his back," and held that "[i]n light of this resistance," the officer's use of his taser was reasonable. *Ibid.*

We have also paid significant attention to the second factor mentioned in *Graham*: whether the plaintiff poses an immediate threat to the safety of the officers or others. A person who is physically violent toward an officer obviously poses a threat to the officer's safety, but an officer can also be justified in using force against a person whose behavior places the officer at risk of being hit by traffic. In *Williams v. Sandel*, we held that, even though the plaintiff was

naked and unarmed, he "created a risk of serious harm by virtue of the location" in the emergency lane of the interstate by the median. 433 F. App'x at 361. "Obviously, the risk of serious bodily injury or death is great when encountering the high-speed traffic present on an interstate." *Ibid.* That risk can be magnified when the plaintiff engages in "erratic" behavior, making it difficult for officers to predict what the plaintiff will do next. *Ibid.*; *see also Caie*, 485 F. App'x at 96.

In evaluating these factors, and others, we must keep in mind that an officer's actions should be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Even if it turns out in hindsight that the plaintiff's "subjective intent" was not to attack or resist the officer, we must view the officer's actions "*objectively*, from the perspective of a reasonable officer at the scene." *Rudlaff*, 791 F.3d at 642. In *Hightower v. City of Columbus*, a plaintiff argued that he raised his hands between himself and an officer not to attack the officer, but to protect himself from being attacked. No. 13-4437, slip op. at 2 (6th Cir. Oct. 3, 2014). We noted that the plaintiff's actions, "*whether intentional or not*, could have led a reasonable officer to believe that [the plaintiff] was actively resisting arrest," and held that the officer's comrade acted reasonably when he used his taser on the plaintiff. *Id.* at 7 (emphasis added). Regardless of the plaintiff's "subjective intent," the crucial question was how "a reasonable officer in the heat of the moment" could have construed the plaintiff's behavior. *Ibid.*

Turning to the case at hand, we begin with the third *Graham* factor. Kelly's actions in the dash-cam video show that he actively resisted the instructions of Sergeant Cook and Deputy Sines. When Cook approached Kelly from the driver side of the truck, he was trying to wake up Kelly so the truck could be towed. Kelly responded with physical aggression by raising both of

his hands above his head and swiping down at Cook's head. Kelly then threw off the shoulder belt of his seatbelt and began to thrash about in his seat. Sines responded by opening the passenger-side door and telling Kelly, "show us your hands," but Kelly continued to thrash and flail in his seat. By attacking Cook and flailing when Sines instructed him to show his hands, Kelly acted in a manner that would have led a reasonable officer to conclude that he was actively resisting the officers.

The second *Graham* factor is also relevant to our analysis. At the beginning of the encounter, Sines, Kelly, and Cook were standing on the left side of the highway in the emergency lane by the median. After Sines removed Kelly from the truck, Sines was standing in the middle of a lane on the interstate, where he could have been hit by a car. Throughout the encounter, multiple vehicles passed by them, traveling at speeds typical of an interstate highway. Given the late hour, visibility was poor, and the only lighting came from the squad car and the officers' flashlights. These dangerous conditions meant that Kelly's erratic and unpredictable behavior could have resulted in Sines, Kelly, or Cook being hit by oncoming traffic. Based on Kelly's aggressive and erratic behavior, the location of the incident, and the poor visibility, a reasonable officer could have believed that Kelly posed an immediate threat to the safety of Cook and Sines.

Kelly argues that Sines acted unreasonably by tasing him because he was restrained by his seatbelt during the entire incident. But when Sines fired his taser, it was not at all clear that Kelly was still wearing his seatbelt. After Sines removed Kelly from the truck, Kelly immediately sprang up to his feet on the pavement of the road outside of the truck, and a reasonable officer making a split-second judgment could have concluded, mistakenly, that

7

Kelly's seatbelt was unfastened. It was only after Sines tried to pull Kelly to the ground for the second time that he appeared to realize that Kelly was still being restrained by his seatbelt.

Kelly also argues that when he stood up outside the truck, he was attempting to comply with Sines's orders. However, even if we assume that Kelly had no intention of harming or resisting Sines, Sines had no idea what Kelly's subjective intentions were at the time Kelly stood up. Perhaps Kelly stood up because he wanted to untangle his seatbelt, but perhaps he wanted to attack Sines. A reasonable officer acting in the heat of the moment would not have known what Kelly was going to do next, given his erratic behavior inside the truck. As such, it was not unreasonable for Sines to use a taser to subdue Kelly. *See Rudlaff*, 791 F.3d at 642 ("His purported subjective intent to comply with the officers' requests fares no better, for we view his actions *objectively*, from the perspective of a reasonable officer at the scene.").

Kelly's final argument with respect to Sines is that Sines's second firing of his taser was unjustified. *See Hagan*, 695 F.3d at 304 (noting that the Fourth Amendment prohibits an officer from subjecting a person to "gratuitous violence"). After Sines first used his taser on Kelly, he told Kelly three times to get on the ground, before saying, "I'll do it again!" Kelly did not get on the ground, and at no point did Kelly give any indication that he was trying to—or was unable to—comply with Sines's orders. Given Kelly's noncompliance, and the fact that Sines was standing in the middle of a lane on the highway, a reasonable officer making a split-second decision could have thought that Kelly posed enough of a threat to warrant a second use of the taser. In light of the rapidly unfolding and potentially dangerous situation, Sines's second firing of his taser was not unreasonable.

In hindsight, Deputy Sines's actions seem excessive, given that Kelly was restrained by his seatbelt during the entire incident. But the Fourth Amendment does not require us to

8

scrutinize officers' actions "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. While Sines's split-second judgment may have proved wrong, his mistake was one that a reasonable officer could have made, given the "tense, uncertain, and rapidly evolving" circumstances. *Id.* at 396–97. As such, his conduct did not violate the Fourth Amendment, and he is entitled to qualified immunity.

Kelly's claim against Cook is based on Cook's failure to intervene in Sines's use of force. In light of our conclusion that Sines acted reasonably, we also hold that Cook acted reasonably when he failed to intervene. Cook's inaction did not violate the Fourth Amendment, and he is entitled to qualified immunity.

IV

Kelly appeals the district court's grant of summary judgment to Sines on his state-law battery claim. In Ohio, employees of a political subdivision are immune from liability, but this immunity does not cover acts or omissions made "with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). Kelly's arguments for applying § 2744.03(A)(6)(b) mirror his arguments for his excessive-force claim. For the same reasons that Sines's actions were a reasonable response to an uncertain and dangerous situation, we hold that he did not act with malice, in bad faith, or in a wanton or reckless manner, and is entitled to statutory immunity from Kelly's state-law battery claim.

V

The judgment of the district court is AFFIRMED.