NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0308n.06

No. 24-5853

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

KATHY HELMS, as legal guardian for BRIAN RUSSELL HELMS,

    Plaintiff-Appellant,

v.

BOYD COUNTY SHERIFF'S DEPARTMENT, et al.,

    Defendants-Appellees.
</td><td>

)
)
)
)
)
)
)
)
)
)
)
)
</td><td>

**FILED**
Jun 17, 2025
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

OPINION
</td></tr>
</table>

Before: McKEAGUE, MURPHY, and DAVIS, Circuit Judges.

MURPHY, Circuit Judge. Brian "Rusty" Helms suffers from a mental illness that led a medical counselor to order his involuntary hospitalization. Helms called his mother when deputy sheriffs attempted to carry out this hospitalization order. While listening on the phone, his mother says that she heard the deputies mock Helms and gratuitously beat and tase him. But the deputies respond that they used the force required to overcome Helms's resistance. And their firsthand accounts about what happened stand alone because Helms did not sit for a deposition. We thus must consider whether Helms's mother created a genuine issue of material fact to dispute the deputies' accounts by describing what she heard over the phone. We agree with the district court that she did not. And because the deputies used reasonable force under their view of events, the court properly granted them summary judgment on Helms's excessive-force claim. We affirm.

I

Helms grew up in Ashland, Kentucky. After graduating from high school, he worked as a bricklayer. He unfortunately became addicted to methamphetamine while in his thirties, which exacerbated his struggles with anxiety and panic attacks. In 2017, he exhibited more serious mental-health problems. Helms started to suffer from "delusions" and "hallucinations" and showed signs of schizophrenia when off his medications. K. Helms Dep., R.92, PageID 484–85, 505–06.

In October 2017, Helms's father petitioned a state court to involuntarily hospitalize Helms because he had been "threatening to harm" his family and himself. Pet., R.92-1, PageID 536. The petition noted that Helms was suffering from "psychotic breaks 24/7," "stuck in [a] delusional state," "[e]xtremely paranoid," and "[a]ggressive." *Id.* It added that Helms had asked his "parents to take him in the woods and shoot him in the head." *Id.* The court ordered the Boyd County Sheriff's Department to take Helms to Pathways, a mental-health provider, for an evaluation and possible hospitalization.

The sheriff's department failed to fulfill this order for over a month. After a phone call from Helms's father, department staff stated that they would dispatch someone to transport Helms to Pathways on November 29. That morning, two deputy sheriffs took Helms into custody and transported him for his evaluation.

Sergeant Carl Hall with the sheriff's department met Helms at Pathways. While waiting on a medical counselor to complete the evaluation, Hall tried to develop a rapport with Helms by talking about, among other things, their family connections. Hall could tell that Helms was struggling with his mental health because Helms made many incoherent statements (including

about collecting "Egyptian artifacts"). Hall Dep., R.93, PageID 572. More disturbingly, Helms noted that he knew "how to disarm police officers." *Id.*

The medical counselor eventually told Hall (in Helms's presence) that Helms must go to Eastern State Hospital for a 72-hour commitment. According to this counselor, Helms's drug abuse had caused him to experience paranoid delusions, psychosis, and suicidal ideation. The counselor hoped that the hospitalization would stabilize Helms's psychosis and "prevent harm to [him]self and others." Form, R.111, PageID 1662. When Helms heard this order, though, he became visibly upset. Hall tried to "de-escalate" things by telling Helms that he would seek to persuade the counselor to change his mind if Helms agreed to wait in Hall's cruiser. Hall Dep., R.93, PageID 574. Helms obliged. But when Hall told Helms that he could not budge the counselor from the hospitalization order, Helms began to hit his head on the car, threatened to sue everyone, and stated that he would not get out. Hall drove an agitated Helms back to the sheriff's department so that a transport deputy from the Boyd County Justice Center could take him to Eastern State Hospital.

The parties dispute what happened back at the department. We start with the deputies' accounts. The department assigned Deputy B.J. Kimmle to transport Helms. While waiting for Kimmle, Hall noticed Helms in his cruiser's backseat talking to his mom on the phone. Hall made a mental note that they would have to secure this phone when they switched cars. Kimmle got delayed, so Hall decided to drive Helms over to the Justice Center to make the transfer.

When Hall arrived there, he told Kimmle about Helms's phone and his comments that he would not get out of Hall's cruiser. Kimmle opened the door to the cruiser and asked Helms for the phone. Helms responded: "Fuck you, fuck them. Fuck this. I am not going." Kimmle Dep., R.95, PageID 748. The deputies repeatedly ordered Helms to put his hands behind his back and

3

to get out. But Helms resisted all efforts to extract him. Instead, he lay down in a supine position with his legs up and his left foot pulled back in an attempt to kick Kimmle. Hall thus went to the vehicle's other side to help remove him. Yet Helms continued to struggle and yell. Once the deputies' verbal orders failed, Hall escalated to using three compliance "strikes" to Helms's back. Hall Dep., R.93, PageID 576. When this force also did not work, Kimmle pulled Helms out of the car by the belt loops on his pants.

According to the deputies, Helms continued to struggle against their efforts to handcuff him while on the pavement. Hall tried to grab Helms's arms while Kimmle tried to get him on his stomach by his feet. In the meantime, Deputy David White had seen the commotion and come by to help. White decided to deploy his taser and alerted the others by shouting "Taser" several times. He used his taser in drive-stun mode. Helms immediately "quit fighting" and became "compliant," so White turned off the Taser after only "two seconds" rather than wait the usual five. White Dep., R.96, PageID 911. Helms then "complie[d] readily" with the deputies and even apologized for his conduct. Hall Dep., R.93, PageID 576–77. Kimmle handcuffed him. Hall placed Helms's phone on the transport vehicle. Kimmle eventually got Helms into that vehicle and began the drive to Eastern State.

During this encounter, Helms's mother thought she heard something far different. Her son had called her while Hall drove back from Pathways. This phone call ended up staying connected for some 30 to 45 minutes. Helms's mother thus heard the struggle between Helms and the deputies.

At the start of the call, Helms complained about having to go to Eastern State. His mother tried to calm him down. She next said she was going to disconnect because she heard a deputy in the background order him to give up his phone. But she stayed on the line when Helms asked her

4

not to hang up. Still, Helms believed that she had left and told a deputy: "See there, she hung up on me." K. Helms Dep., R.92, PageID 498. His mother then heard "scuffling" and her son "screaming out in pain and begging them to stop." *Id.* She believes that the deputies called her son a "crazy psycho" and told him that he "had this coming all morning." *Id.*, PageID 498, 502. (The deputies denied these statements.) She also heard a deputy say: "Tase the motherfucker." *Id.*, PageID 502. The altercation lasted about "five to eight minutes." *Id.*, PageID 501. Helms repeatedly cried for help, and his mother yelled into the phone for the deputies to stop.

As the confrontation was ongoing, Mrs. Helms decided to drive to the sheriff's department with the phone in her passenger seat. As she walked to her car, her husband and daughter arrived home and chose to accompany her. On her way to the department, she heard a deputy start "driving" Helms. *Id.*, PageID 499. Helms asked this deputy for a drink. The deputy responded with "more profanity" about Helms being a "psycho." *Id.* He also allegedly added: "I'm taking you straight to Eastern and dropping you off. If you move, I'll put a bullet in your head." *Id.* For what it is worth, Deputy Kimmle admitted that he tried to make Helms compliant by saying that he should "stop moving" or Kimmle would "put a bullet in his ass." Kimmle Dep., R.95, PageID 751. Helms allegedly had been "thrashing around" in the transport vehicle. *Id.*

When the Helms family arrived at the sheriff's department, they spotted Sergeant Hall and asked to speak with him. Hall responded: "Just as soon as I get your son's blood off my hands." K. Helms Dep., R.92, PageID 499. The family then talked to Sheriff Bobby Jack Woods. Woods ordered Kimmle to return to the sheriff's department. When Kimmle got back, Woods and Helms's father checked on Helms. They disconnected the phone call. Helms had a cut on his head, a "busted lip," "abrasion[s]" on his back, and "lacerations" on his legs. *Id.*, PageID 492–93.

As a result of these events, Helms brought this suit under 42 U.S.C. § 1983 against (among other defendants) Boyd County, Sheriff Woods, Sergeant Hall, and Deputies Kimmle and White. As relevant now, the complaint alleged that the deputies had used excessive force against Helms in violation of the Fourth Amendment. It also alleged that they had retaliated against him for his speech in violation of the First Amendment. And it alleged that they had treated him differently due to his disability in violation of the Equal Protection Clause. Helms sought to hold the County and Sheriff liable for the failure to adequately train the deputies.

Shortly after Helms sued, he began to suffer from even worse "delusional behaviors." K. Helms Dep., R.92, PageID 483. So a state court appointed his mother as his guardian and conservator. She took over this case on his behalf. According to his mother, Helms could not answer basic questions about the events. He thus did not sit for a deposition, did not provide a supporting affidavit, and would not have testified at trial.

Helms's lack of participation all but doomed his case. The district court held that his mother's testimony about the phone call did not create a genuine dispute of material fact over the deputies' claims that Helms had acted aggressively at the sheriff's department. *See Helms v. Boyd County Sheriff's Dep't*, 2024 WL 3881842, at *4–7 (E.D. Ky. Aug. 20, 2024). And under the deputies' version of events, the court added, they used reasonable force to restrain him. *See id.* The court also rejected Mrs. Helms's free-speech claim because she did not point to any protected speech. *See id.* at *7–8. It likewise rejected Mrs. Helms's equal-protection claim because she lacked evidence that the deputies used force on Helms because of his disability. *See id.* at *8–9. Lastly, the court held that Mrs. Helms could not assert a failure-to-train claim against Sheriff Woods in his personal capacity and that she could not hold Boyd County liable on this theory

6

because she had not shown any underlying constitutional violation. *See id.* at \*9–11. We review this decision de novo. *See Gambrel v. Knox County*, 25 F.4th 391, 399 (6th Cir. 2022).

## II

The briefing strategy of Mrs. Helms's counsel has reduced the claims that we must consider on appeal. Her opening brief did not "adequately develop" any challenge to the dismissal of her free-speech or equal-protection claims against the deputies or her failure-to-train claims against Sheriff Woods and Boyd County. *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 881–82 (6th Cir. 2024). And her attempt to salvage her free-speech claim in her reply brief "came far 'too late.'" *Id.* at 887 (citation omitted). She has thus forfeited these claims. *See id.* at 881–82, 887.

This forfeiture leaves only an excessive-force claim under the Fourth Amendment against Sergeant Hall and Deputies Kimmle and White. The deputies assert that they complied with the Fourth Amendment or, at the least, that they did not violate clearly established law and so should receive qualified immunity. *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). We opt to resolve this appeal on the constitutional merits under our established precedent.

## A

The Fourth Amendment prohibits police officers from making "unreasonable" "seizures" of individuals. U.S. Const. amend. IV. Courts typically consider the validity of a seizure when police officers arrest suspects for alleged criminal violations. *See, e.g.*, *Torres v. Madrid*, 592 U.S. 306, 311–18 (2021); *United States v. Watson*, 423 U.S. 411, 415–24 (1976). But the Fourth Amendment's language also restricts the government's ability to seize individuals for mental-health reasons. *See, e.g.*, *Hoogland v. City of Maryville*, 2022 WL 1773416, at \*4 (6th Cir. June 1, 2022); *Est. of Hill v. Miracle*, 853 F.3d 306, 312–16 (6th Cir. 2017); *Caie v. West Bloomfield Township*, 485 F. App'x 92, 96–97 (6th Cir. 2012); *Monday v. Oullette*, 118 F.3d 1099, 1102–04

(6th Cir. 1997). To make that type of seizure, officers must have probable cause that individuals pose a danger to themselves or others. *See Machan v. Olney*, 958 F.3d 1212, 1214 (6th Cir. 2020). Mrs. Helms agrees that the deputies had this probable cause here because they were trying to take her son to Eastern State Hospital based on a court order and a counselor's diagnosis.

Even if officers have probable cause for a mental-health seizure, though, they still must carry out the seizure in a reasonable way. *See Monday*, 118 F.3d at 1104. They thus may not use excessive force when taking an individual to a hospital. *See Hoogland*, 2022 WL 1773416, at *4. We evaluate whether force was excessive by considering the need for the force from the perspective of a reasonable officer under the totality of the circumstances. *See Caie*, 485 F. App'x at 95. And we balance a police officer's interests in using the force against the individual's interests in avoiding it. *See Chaney-Snell v. Young*, 98 F.4th 699, 715–16 (6th Cir. 2024). This balancing focuses on different factors for mental-health seizures than those that apply to criminal seizures. *See Est. of Hill*, 853 F.3d at 314. In the criminal context, for example, the reasonableness of force depends in part on the crime that an individual allegedly committed (the more serious the crime, the more reasonable the force). *See Graham v. Connor*, 490 U.S. 386, 396 (1989). But this factor makes little sense for mental-health seizures because individuals suffering from mental impairments have not thereby committed crimes. *See Est. of Hill*, 853 F.3d at 314. In that context, then, we instead ask such questions as whether individuals posed an immediate risk of harm to themselves or others and whether the amount of force was reasonably necessary. *See id.*

Under this framework, we have generally upheld the use of a taser and similar levels of force when individuals actively resist an officer's attempts to take control of them. *See Roell v. Hamilton County*, 870 F.3d 471, 482–83 (6th Cir. 2017); *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012); *Caie*, 485 F. App'x at 96. Consider *Caie*. There, a man's

8

friends alerted authorities that he was intoxicated and suicidal. *See Caie*, 485 F. App'x at 93–94. When officers found the man in a lake, he asked them to shoot him. *Id.* at 94. After he came to the shore, the officers tried to arrest him to take him to a hospital. *Id.* But he refused to comply and tried to run from the officers "while flailing his arms violently." *Id.* So the officers took the man to the ground and eventually tased him when he resisted their handcuffing efforts. *Id.* We found this force reasonable. *Id.* at 96. Given his suicidal and intoxicated nature, the officers reasonably believed that he was a threat to himself or others. *Id.* And they reasonably used a taser while the man was on the ground because he was "actively resisting [their] attempts to secure his arms behind his back." *Id.* at 97; *see also Monday*, 118 F.3d at 1104–05.

This case is like *Caie* under the deputies' version of the facts. The deputies reasonably believed that Helms posed an "immediate threat" to himself and others. *Est. of Hill*, 853 F.3d at 315. Among other evidence, a court had ordered Helms to undergo a mental-health evaluation because he had been "threatening to harm" his family and himself. Pet., R.92-1, PageID 536–37. And a medical counselor had just found him suicidal and delusional and ordered him immediately hospitalized because of this risk of harm. Form, R.111, PageID 1662. Helms had also disclosed his knowledge of "how to disarm police officers" to Hall. Hall Dep., R.93, PageID 572. And he had acted upset after learning of the involuntary hospitalization. *Id.*, PageID 574.

Likewise, the deputies used the force "reasonably necessary" to transfer Helms to Eastern State Hospital. *Est. of Hill*, 853 F.3d at 315. Helms engaged in "active resistance" when the deputies tried to get him out of Hall's cruiser and into the transport vehicle. *Hagans*, 695 F.3d at 509. He disobeyed commands to hand over his phone and exit the cruiser. He also tried to kick Kimmle to prevent his removal. Hall Dep., R.93, PageID 576; Kimmle Dep., R.95, PageID 753.

9

So the deputies used the type of force (compliance strikes and pulling on Helms's body) reasonably related to overcoming his "resistance" and getting him out of the car. *See Chaney*, 98 F.4th at 717.

Deputy White next reasonably used a taser. Helms continued to struggle with Hall and Kimmle on the ground to try to avoid getting handcuffed. *See Caie*, 485 F. App'x at 97. White also tased Helms only for the "two seconds" required to make Helms "compliant" and then stopped once Helms ended his resistance. White Dep., R.96, PageID 911. So this force falls within our general rule that "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans*, 695 F.3d at 509.

B

Mrs. Helms responds with both factual and legal points. Factually, she argues that the district court improperly rejected her testimony as hearsay and wrongly resolved evidentiary disputes in the deputies' favor. She is mistaken. For starters, Mrs. Helms misconstrues the district court's decision when she suggests that it rejected her testimony on hearsay grounds. It did no such thing. So her arguments about the federal hearsay rules are beside the point. Instead, the court held that—even accepting Mrs. Helms's testimony as true—she heard nothing during her phone conversation with Helms that conflicted with the deputies' accounts of her son's combative conduct. *See Helms*, 2024 WL 3881842, at *6.

This case thus turns on whether Mrs. Helms identified enough circumstantial evidence to create a factual dispute over whether Helms actively resisted. On that front, we agree with the district court that she did not. As her best evidence, she allegedly heard an unknown deputy call her son a "[c]razy psycho motherfucker" and tell him that he "had this coming" and "deserve[d] what [he was] getting" during the struggle. K. Helms Dep., R.92, PageID 502. Even accepting that a deputy made these statements (they denied it), the statements would not allow a reasonable

jury to reject the deputies' testimony that they used force because of Helms's refusal to exit Hall's cruiser and get handcuffed. As the district court noted, the deputies used "unprofessional" language that must have been "terribly difficult" for Mrs. Helms to hear. *Helms*, 2024 WL 3881842, at *6. But the language does not itself qualify as excessive force. And the claim that it might show that Helms did not resist amounts to the type of "speculation" that cannot withstand a summary-judgment motion. *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 945 (6th Cir. 2022).

Mrs. Helms also heard her son repeatedly cry out and ask for help. K. Helms Dep., R.92, PageID 502. But this fact supports the deputies' accounts. As Hall explained, Helms was "hollering and screaming" "stop" and "quit" as he resisted their efforts to remove him from Hall's cruiser. Hall Dep., R.93, PageID 576. And it should not be surprising that he would object in this way because he was delusional and did not want to get hospitalized.

Mrs. Helms next points out that she heard Kimmle threaten to "put a bullet in [her son's] head" if he moved. K. Helms Dep., R.92, PageID 499. But this conversation happened well after the use of force while Kimmle drove Helms to Eastern State Hospital. According to Kimmle, Helms was "thrashing around" in the backseat, had gotten his seatbelt off, and was trying to move in a way that would get his cuffed hands from "behind" his back to "in front of him." Kimmle Dep., R.94, PageID 751–52. Kimmle had no intention of shooting Helms and threatened to "put a bullet in his ass" as an "intimidation technique" to convince Helms to stop moving. *Id.*, PageID 752. This language may well have been bad police work—as evidenced by Sheriff Woods's decision to "verbally reprimand[]" Kimmle for it. Woods Dep., R.97, PageID 1071. But the comment says nothing about what happened earlier during the physical encounter.

Apart from what she overheard on the call, Mrs. Helms separately tries to undercut Sergeant Hall's account with alleged inconsistencies in his testimony. Hall, for example, at one

point suggested that Helms's phone use kept him calm but later suggested that Helms became animated when speaking to his mom. Similarly, some confusion exists about how Helms's cellphone got from the floor of Hall's cruiser to the floor of Kimmle's transport vehicle (where Sheriff Woods allegedly found it). Mrs. Helms infers that Kimmle must have taken Hall's cruiser to Eastern State. And she finds it suspicious that Hall drove to the Justice Center to meet Kimmle, suggesting that he did so to be in a more isolated area. Yet this "conjecture" would not allow a reasonable jury to second guess the deputies' undisputed testimony that Helms struggled with them to avoid his hospitalization. *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).

Legally, Mrs. Helms suggests that the deputies unreasonably seized her son because they did not account for Helms's mental state when deciding to physically restrain him. True, deputies should consider a party's "diminished capacity" as a factor in the totality of circumstances on the proper force. *Roell*, 870 F.3d at 482. But Helms's mental-health struggles did not bar the deputies from using the force required to get control of him and end his resistance—even if that resistance sprang from his delusions. *See id.*; *Caie*, 485 F. App'x at 96–97.

Mrs. Helms lastly relies on three cases with far different facts. *See, e.g.*, *Palma v. Johns*, 27 F.4th 419, 430–32 (6th Cir. 2022); *Stewart v. City of Euclid*, 970 F.3d 667, 673–74 (6th Cir. 2022); *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013). In *Palma*, for example, a man "never physically resisted" and simply failed to follow an officer's orders before an officer tased (and later shot) him. 27 F.4th at 430. The undisputed testimony from the deputies in this case, by contrast, shows that Helms was physically resisting when White tased him. Next, *Stewart* found that an officer had unconstitutionally shot and killed a suspect to get the suspect to stop his car. 970 F.3d at 672–74. This lethal force says nothing about the deputies' non-lethal force. And *Martin* held that officers had used excessive force by tackling and placing their weight

12

on top of a mentally unstable suspect until he died from asphyxiation. 712 F.3d at 957–60. Here, however, the deputies ended their force once Helms's resistance stopped.

We affirm.